106 P.3d 627 (2005)
338 Or. 58
In the Matter of Robert James Jon Smith, a Minor Child.
STATE ex rel. DEPARTMENT OF HUMAN SERVICES, Respondent on Review,
v.
Diana Marie SMITH, Petitioner on Review.
In the Matter of Jon Bow Robert Michael Lea Smith, a Minor Child.
State ex rel. Department of Human Services, Respondent on Review,
v.
Diana Marie Smith, Petitioner on Review.
(CC 01J0049, 02J0938; CA A119798, A121395; SC S51293, S51339).
Supreme Court of Oregon, En Banc.
Argued and Submitted November 3, 2004.
Decided February 17, 2005.
Maryhelen Sherrett, Portland, argued the cause and filed the petitions for petitioner on review.
Laura S. Anderson, Assistant Attorney General, Salem, argued the cause for respondent on review.
*629 GILLETTE, J.
These two parental rights termination cases, which we have consolidated for opinion, test the bounds of a state agency's authority to exact a parent's compliance with various conditions in order to secure the return of her child. In the present cases, we hold that the agency exceeded those bounds.
The trial court terminated mother's parental rights to her first son, whom the state had removed from mother's care at birth. The court's order recited the statutory criteria for termination upon a finding of unfitness, but it did not elaborate. In a brief, per curiam opinion, the Court of Appeals, sitting en banc, affirmed that ruling. State ex rel. Dept. of Human Services v. Smith, 190 Or.App. 570, 79 P.3d 374 (2003) (Smith I). Three judges dissented in that case on the ground that, in their view, the facts of the case did not meet the standard necessary to justify termination of mother's parental rights to the child. Id. at 571, 79 P.3d 374 (Schuman, J., joined by Landau and Armstrong, JJ., dissenting). Less than six months after terminating mother's parental rights to her first son, the trial court terminated mother's parental rights to her second son, whom the state also had removed from mother's care at birth. The Court of Appeals affirmed that ruling in a per curiam opinion that cited its earlier decision with respect to the first son. State ex rel. Dept. of Human Services v. Smith, 191 Or.App. 137, 80 P.3d 522 (2003) (Smith II). Two judges *630 concurred, stating that, in their view, the state had failed to establish the requirements for termination by clear and convincing evidence, but that they were constrained by the court's decision in the earlier case. Id. at 138, 80 P.3d 522 (Landau, J., joined by Armstrong, J., concurring). We allowed review in both cases. For the reasons that follow, we reverse the decisions of the Court of Appeals.
In reviewing a decision of the Court of Appeals in a parental rights termination case, this court may review the decision de novo, or it may limit its review to issues of law. ORS 19.415(4); See State ex rel. SOSCF v. Stillman, 333 Or. 135, 138, 36 P.3d 490 (2001) (explaining rule). Because neither the trial court nor the Court of Appeals made findings of fact in the first of these cases, and because the outcome in the second case largely depended on the trial court's ruling in the first, we elect to view the record de novo. We find the facts relied on in this opinion based on our de novo review of the record.
At the time of the events leading up to the first parental rights termination hearing, mother was a 28-year old woman with an IQ of about 80, which put her in the "low average" range. She was a high school graduate, and she had earned As and Bs in school. Mother had held various jobs since graduating from high school, including working for a janitorial service, providing childcare for several other families, and helping her mother manage a nearby apartment complex. She usually earned between $800 to $1,200 per month.
Neither mother nor anyone in her parents' household used drugs or alcohol or, apparently, ever had been convicted of any crime. No one in the household ever had committed domestic abuse or assaulted anyone in the family.
Until the Department of Human Services (DHS) became involved in her case, mother lived in an apartment in her parents' house. The family was extremely close-knit. Mother's parents had been married for more than 32 years. Mother never had lived on her own, and her two adult brothers lived in a camper in the backyard. The entire family ate dinner together every night, and mother frequently cooked the family meal. Mother relied heavily on her family for support and social interaction.
Mother first learned that she was pregnant with her first child in November 2000, when, accompanied by her mother, she went to a hospital complaining of stomach distension. She was seven months pregnant at the time. Both women vehemently challenged the doctor's diagnosis of pregnancy because, they said, mother had continued to menstruate monthly and mother did not believe that, strictly speaking, she ever had had sexual intercourse.[1] They went so far as to seek a second opinion, which confirmed the diagnosis. Eventually, on January 22, 2001, mother, again accompanied by her own mother, went to Salem Hospital to deliver her child. She initially denied to the nurses that she was pregnant and continued to insist that she was a virgin. Then, she claimed that she must have become pregnant by taking a bath or a shower in the same bath or shower in which either her 14-year-old foster brother or other men that her parents had permitted to shower at their house earlier had masturbated.[2] She also initially gave hospital personnel her mother's name as her own, asserted that the child was her mother's and not hers, and asserted that the baby was her brother and not her son. Those outlandish claims led hospital workers to suspect that mother might be mentally ill. They called the Department of Human Services (DHS).
A DHS supervisor, Hunter, visited mother in the hospital shortly after her son was *631 born. Hunter insisted on speaking to mother outside the presence of her family members or her pastor. During that conversation, mother repeated and elaborated on the conception by masturbation story, this time implicating only the two men who had showered at her parents' house on the day she supposedly conceived. In addition, mother told Hunter, untruthfully, that she had tried to obtain prenatal care after learning of the pregnancy, but had been denied care by six different doctors. Mother also told Hunter that she was going to name the child Jon Allen Ruston, after a family friend (not the father of the child). Hunter knew that Ruston was a convicted sex offender who lived in mother's neighborhood. Mother denied having known that Ruston was a sex offender, although she knew that he was not allowed in the house unless her father was present.[3]
Hunter told mother that DHS would be placing the baby in protective custody. Hunter explained that she was concerned about the people in and around mother's home, about the decisions that the family was making, about mother's mental health and her ability to care for a baby, and about the fact that mother had had no prenatal care.
The next day, on January 23, 2001, a DHS caseworker, Bradley, visited mother in the hospital and conducted a shelter hearing with the court via telephone conference. During that hearing, mother acknowledged that she had had sexual contact and identified the person whom she believed to be the baby's father. She explained that one of the reasons that she had lied about the baby's conception was that she was ashamed of the pregnancy and wanted to keep it from her parents. She also stated that she had changed the baby's name on learning that the man for whom she had named him was a sex offender. Nonetheless, DHS proceeded with the hearing to place the child in protective custody.
Bradley explained to the court and to mother that protective custody was necessary because mother had told a bizarre story about the child's conception, because the state was concerned that the foster brother might be the father of the child,[4] because mother failed to obtain prenatal care, because mother had denied the pregnancy, because mother initially named the baby after a sex offender, because there was a risk that a sex offender would have access to the home, and because there was a picture of the sex offender on the wall of mother's home, between two pictures of Jesus.
The court ordered that the child be placed in protective custody and ordered visitation for mother. The parties discussed "expectations" for mother, including that she maintain appropriate housing and a verifiable source of income. The court also ordered that mother be evaluated by a psychologist.
About two weeks later, a psychologist, Dr. Stolzfus, evaluated mother. Based on his observations and testing, Stolzfus opined that mother had a low average IQ and that she appeared to be depressed, probably because of the loss of her child and her shame over the pregnancy. He also stated that
"[mother] functions fairly well in a well structured environment with clear expectations. In ambiguous and confusing situations, she quickly decompensates into depressive episodes, feeling overwhelmed and has difficulty making sense of her environment. In a complex environment she has difficulty translating information accurately, the quality of her processing is unsophisticated, though she is highly motivated and makes considerable effort."
Stolzfus concluded that mother
"does not appear to pose a risk physically or emotionally to her son, despite her earlier *632 denial of the pregnancy and unusual explanation of how the pregnancy occurred. * * * Testing indicates that she does not do well in an unplanned, complex environment, which will obviously pose some difficulty in caring for an infant. Within the structure of her parents' home, she is deemed well able to care for her infant. To her benefit, she apparently has considerable experience in providing childcare for young children."
In the end, Stolzfus "[s]trongly recommend[ed] immediate return of [the child] to the care of his mother and his grandparents to avoid disruption of the natural mother and child bond."
DHS ignored Stolzfus's recommendation. Instead, the agency initiated twice weekly home visits with the child.[5] After a few weeks, those visits were discontinued, however, apparently because the DHS worker assigned to supervise the visits, Sanders, did not feel that mother was interacting sufficiently with the baby, preferring to walk around with him rather than play with toys, and because mother's mother, grandmother, was agitated and hostile during the home visits.
The visits were moved to a DHS facility, where mother and the child were placed in a large room with eight other mothers and their babies. Mother arrived on time, even early, for every visit. However, DHS was unsatisfied with mother's effort. Sanders noted that, during the visits, mother did not seem to accept suggestions for caring for the child. As another DHS social service assistant later testified, mother did not make the visits "enjoyable" for the child and he seemed bored. For example, she did not offer him a wide array of toys to play with, she did not make what Sanders considered to be proper eye contact with him, and she tickled the child too much. In addition, Sanders complained, mother tried to divert attention to herself from Sanders and from the other parents in the room, and the other parents found her annoying.
In May 2001, DHS conducted a "family unity" meeting, at which many of mother's family members were present, including the child's grandparents and mother's brothers. The family was extremely hostile toward and distrustful of the agency. The family accused the agency of falsifying records and insisted on having the meeting tape-recorded for later verification. They maintained that DHS had had no right to remove the child and that the agency had not followed proper procedure in removing him. The family was very disrespectful of DHS staff, at times yelling at the case workers, cutting them off, and targeting them, especially Sanders, with derogatory remarks. Sanders later testified that she felt intimidated and very frightened by the family.
Earlier, in April 2001, the court at DHS's request had ordered mother to submit to another psychological evaluation by a different psychologist, Dr. Sweet. Three days after the contentious "family unity" meeting in May, DHS sent a 12-page letter to Sweet to provide him with certain "background information." Among other things, the letter recounted the outlandish stories that mother had told about her virginity and the conception, the initial suspicions about the foster brother being the father of the child, and Ruston's visits to the family home.[6] The letter summarized various other lies and exaggerations mother had told before and after the birth of the child.[7] Further, the letter explained that DHS had had two earlier referrals concerning the family, one of which concerned an allegation that the foster child had been permitted to have contact with Ruston, and the other concerning a report *633 that a neighbor had seen grandmother "switching" her 30-year-old son in the back yard. The letter then described the May 15 "family unity" meeting. Additionally, it described in detail grandmother's history of having been raped three times as a teenager, as well as the agency's involvement with other family members living outside the household. The letter did not include any positive information about mother or her family. For example, it did not note that mother's parents had been married for over 32 years, that they had successfully raised four children of their own, or that no one in the household apparently ever had used drugs or alcohol or been convicted of any crime.
Sweet evaluated mother a week later. He did not interview any family members or observe mother with the child. Instead, he relied on his interview with mother, her test results, Stolzfus's report, and the agency's visitation notes. Sweet concluded, as did Stolzfus, that mother is of low-average intelligence and that she appeared to be depressed. Unlike Stolzfus, Sweet suspected that mother suffered from Dependent Personality Disorder, but he could not make that diagnosis conclusively based on the information available. Like Stolzfus, Sweet found that mother operates on a concrete level and knows very little about the world around her. Further, he opined that mother's experience as a childcare provider would not suffice in determining whether she could parent her own child and that she showed "poor judgment and perhaps diminished capacity" in becoming pregnant in the first place. Sweet concluded by stating:
"[O]ne obviously unknown factor in this case has to do with her parents and how they will contribute to rearing this child and monitoring [mother]. I suspect there are some concerns about [mother's] mother, who seemed to have been supporting the conception by masturbation explanation. I would assume that you will closely examine the [family's] home to determine if this will be a safe environment for [the child]. I assume that since [the foster child] is out of the home that concern has been addressed. However it is not clear what happened with Mr. Ruston and what kind of involvement he has with the family. When these issues are resolved, then you can be more sure about whether [the child] could be returned to that home."
The court held another hearing on the matter in June 2001. At the conclusion of that hearing, the court ordered mother, among other things, to obtain an "independent living situation." It appears from the record that the court's reason for imposing that requirement was that it was the agency's view that mother depended too heavily on her family and that the family was extremely hostile to the agency and refused to concede that DHS had had the right to take the child from them.[8] A later report reflected that the agency also did not view the grandparents' home as an appropriate place for the child because grandmother initially supported the conception story, the grandparents had allowed a sex offender to be in their home, and grandmother "ha[d] been receiving public assistance fraudulently."
From then on, the agency's primary focus appears to have been to require mother to become more independent from her family. In service agreement after service agreement, the agency tried to have mother agree to move out of her parent's home. Beginning in July 2001, the service agreements specifically required mother to agree to
"[s]eek and obtain independent stable housing by [a particular date], with the understanding I can not live in the apartments next to my parent's home."
(Emphasis and boldface type in original.) Mother refused to sign the agreements.[9] A DHS permanency worker, Holmes, later testified that mother "was real clear that she *634 had no intentions of getting independent living. In fact, she had told me on several occasions that she had no plan to get independent living, that she was close to her family and that nobody could make her move out."
The service agreements also began requiring mother, among other things, to "[s]uccessfully complete a counseling program for myself regarding my mental health issues as outlined in Dr. Sweet's evaluation." (Emphasis in original.) In response, in September 2001, mother sought therapy for her depression from a private counselor, MacKendrick.
In a report that MacKendrick made to one of mother's lawyers in an effort to assist her with her case, MacKendrick stated that mother had numerous strengths that should be weighed against her known deficits and that she had shown herself capable of being a productive person, a "good student, good worker, [a] caring person, [leading a] clean and sober lifestyle, and responsible person." MacKendrick went on to express utter incredulity that the state had taken the child at birth and refused to return him to her care. He questioned why it would not have been preferable to permit mother to take the child home and provide further support there if needed. He went on to write,
"[t]he issue of dependency of [mother] upon her parents has been brought up in sessions and we have had the occasion to discuss their understanding of this case as well. In our meeting with [grandparents] we found them to be appropriate and fluent regarding their concerns and involvement with their daughter. We cannot fully comprehend why the state purportedly requires removal to a separate domicile as it is our understanding that [mother] has her own apartment and lives independently of her parents.
"Indeed, to have additional support of grandparents following the birth of a child appears to have merit widespread in our society and is viewed as desirable."
DHS also directed mother to ride the bus to the visitations rather than accept rides from various family members. According to DHS, that condition was necessary for mother to prove her independence. Mother refused to abide by that condition, stating that she did not understand the agency's position and offering that her lawyer had told her that she was within her rights to have her family drive her. The agency responded by reminding mother that her son had been in foster care for many months and it was important for mother to ride the bus in order to get her son back.
Over the next several months, in the eyes of the case workers, mother made negligible progress in improving her parenting skills. Ultimately, the agency changed its goal from unification of parent and child to the goal of freeing the child for adoption. The agency filed a petition to terminate mother's parental rights, and the court scheduled a permanency hearing.
The permanency hearing took place in April 2002. By that time, mother had moved out of her parent's home and into an apartment of her own.[10] She was consistently attending a computer training school and had nearly completed the program. Nonetheless, the agency was unsatisfied. DHS worker Holmes characterized mother's apartment as "low income housing" and described the apartment complex where mother rented her apartment as "trashy looking and [the landlord] rents to sex offenders and criminals, people with criminal histories." Holmes also discounted the fact that mother was doing well in a computer training program, admitting that she had not checked mother's school records because it "wasn't an issue with [Holmes], whether [mother] went to school or not."
Among other evidence adduced at the permanency hearing, several witnesses testified that the putative father had died in June 2001 and that the foster brother was no longer living in the grandparent's home. Despite the fact that the putative father was no longer in the picture, the state presented evidence that the putative father had had a criminal record, including convictions for possession *635 of a controlled substance, giving false information, sex abuse, and manslaughter, and that the putative father's adult son, who lives out of state, had been ordered to participate in sex offender treatment. The state also presented evidence that grandmother's brother, who frequently participated in the family meetings, had a criminal record for assaulting a girlfriend. Prior to the permanency hearing, however, mother had accused grandmother's brother of stalking her and had obtained a restraining order against him.
Among other witnesses, mother introduced the testimony of several women for whom she successfully had provided childcare over the previous ten years. At the time mother provided the childcare, the children ranged in age from infants to teenagers. All the women reported that mother was completely appropriate with the children, cooked for them, kept them well fed, clean, and safe, and put them to bed and occasionally stayed with them overnight. They also all reported that their children loved mother and that none of their children ever had suffered any injury or harm of any sort while in mother's care.
At the conclusion of the hearing, the court found that DHS, "above the standard required, ha[d] made active efforts on behalf of the mother and child in order to reunify parent and child." The court also found that mother had made insufficient progress to make it possible to return the child safely to her, that further effort would not make it possible to return the child safely to her within a reasonable time, and that the appropriate permanent plan for the child was adoption. The court stated that DHS no longer was obligated to provide mother with services and ordered the case to proceed toward adoption.
In August 2002, the parties went to trial on the state's petition to terminate mother's parental rights. At that trial, the parties agreed to admit into evidence all the testimony and evidence presented at the April permanency hearing.
The state first presented several witnesses who testified about mother's failure to "bond" with the child during group visitations. Those witnesses explained that mother refused to read the parenting materials given to her and that she did not often read books to the child or play with him with more than a couple of the wide assortment of educational toys available to them. They testified that the child went to mother willingly, but did not appear animated. The child laughed when mother took his picture and clung to her when he felt frightened or insecure, but mother did not "focus" on the child's needs. When the child did something mother did not like, she merely scolded him mildly rather than redirecting him. One witness testified that "[t]here is no light in his eyes. There is no joy on the face you would think you would see from a child that hasn't seen his mother in a week." By contrast, when the child was with his foster parents, he was "bubbly and giggly." All the state's witnesses testified that they saw virtually no improvement in mother's parenting prior to the termination trial.
Those witnesses also complained that mother continually used the door designated for foster parents, rather than the door designated for birth parents, when entering and leaving the building, which made the foster parents uncomfortable. They also testified that mother annoyed other parents during the group visitations by seeking attention for herself and that she allowed the child to interfere with other families' attempts to bond during those meetings, despite being cautioned repeatedly not to do so.
Finally, all the state's witnesses testified at length that mother routinely told outrageous stories, lies even, about all manner of improbable things. For example, she insisted that she was a "licensed day care provider" when, although she was, in fact, paid by the state to provide day care for other families, she was not actually "licensed." She claimed that she was allergic to city water and bathed daily in bottled water. She claimed to be hypoglycemic, although her medical records revealed no such thing. She denied that Ruston's picture ever hung on the wall of her parents' home between two pictures of Jesus, although several DHS workers saw it there.
It also was apparent at the termination trial that mother was pregnant again. *636 Again, she had not sought prenatal care up to that point.[11] During mother's testimony, the court questioned mother at length about, among other things, the paternity of the second child, openly doubting her assertion that she became pregnant after a single sexual encounter.
Mother's case consisted primarily of her own testimony. Mother testified about, among other things, her babysitting experience with other children and the fact that she had had no complaints in that regard; the fact that she did not smoke, drink, or use drugs; and that she goes to church every Sunday and would take her children to church with her as well. She concluded, in answer to a question from the state about what the child needed from a parent, with the following:
"A loving, caring parent that would treat him right, treat him like he's respectable, and raise him right, the way I was raised by my parents, to respect one another, get proper education, feed him and clothe him. Which I know I can do, but nobody has given me a chance to. Outside of the building nobody has ever given me a chance to, not even have home visits unsupervised."
In September 2002, the trial court terminated mother's parental rights. In a letter informing the parties of the ruling, the court stated that it had found "by clear and convincing evidence that it is in the child's best interests that he be freed for adoption and that the parental rights of [mother] be terminated." The court stated that
"[t]he court further finds that mother possesses an emotional illness and mental deficiency of such nature and duration as to render her incapable of providing proper care for the child for extended periods of time. This is not just a case of I.Q. Since the child was taken into care nearly 20 months ago, mother has made negligible progress in adjusting her condition and circumstances and it appears reasonable that no lasting adjustment can be effected."
The court then issued an order that contained no specific findings of fact but that recited the statutory criteria for termination of parental rights under ORS 419B.504, including the finding that "mother is unfit by reason of conduct or condition seriously detrimental to the child and integration of the child into the mother's home is improbable within a reasonable time due to conduct or conditions not likely to change."
In October 2002, mother gave birth to her second child, another son. DHS immediately sought and obtained a court order placing the child in protective custody, and mother was not permitted to take the child home with her from the hospital. Mother's family again was extremely distrustful of the agency. Mother's lawyer unsuccessfully attempted to intervene to prevent DHS from taking the child and from contacting mother or her family. In addition, because he and the family thought that mother had been treated unfairly with respect to the first child, mother's lawyer advised mother not to participate in agency-supervised visitations until he could arrange to have a neutral observer present. She accepted that advice and did not see the child for about six weeks after his birth.
In November 2002, the state petitioned to terminate mother's parental rights to the second child.[12] The petition alleged that the court should terminate mother's parental rights on two separate grounds. First, the petition alleged that mother is unfit by reason of extreme conduct toward another child, based on the earlier termination of her rights as to the first child. Second, the petition alleged that mother is unfit by reason of conduct or condition seriously detrimental to the child, based on her failure to learn parenting skills for the first child, her emotional illness, mental illness or mental deficiency rendering her incapable of providing care for the child, and her lack of effort to adjust her circumstances to make return of the child possible. The court conducted a termination trial in February 2003.
*637 At the second termination trial, the parties stipulated to the admission of all the evidence and testimony that the court had admitted at the first trial six months earlier. The state again called Sweet, who had not seen mother in the two years since his first examination of her, to testify, from a psychological perspective, about mother's ability to parent her child, and called several DHS witnesses to testify about mother's lack of improvement in her parenting skills.
Sweet testified that he did not view the main problem with mother as hinging on her ability to provide shelter and food to the child, in light of the fact that she would have the support of her family. Rather, his continuing concern was whether
"on a day-to-day basis, if she could meet even some of, you know  is she going to give the correct formula to an infant? Is she going to give adequate nutrition? Again, it was not  there is not a real clear out-in-your-face problem. It's just that I couldn't get enough from her to have her demonstrate that she had a clear understanding of how to handle things on a daily basis on her own, if that makes sense."
The DHS witnesses had observed mother's visits with both her first child and her second child and testified at the second termination trial that mother was not making any progress at all in developing parenting skills. Their observations concerning mother's ability to bond with the second child were very similar to those with respect to the first child. One witness, Sanders, testified, for example, that mother did not interact with the child or respond to his cues. When questioned about her visitation notes reflecting that mother frequently wanted to hug and cuddle the child, Sanders answered that that was not what she meant by "interactions." She testified, "Well, to me, interaction is if she would make eye contact, talk with the baby, try to get him to smile, try to get him to respond to her."
Mother's case consisted principally of the testimony of Stolzfus, who had evaluated her again a week before the trial, and of mother herself. Stolzfus testified that, given the facts that mother had moved out on her own and had nearly completed the computer course, mother seemed to be functioning at a higher level. He agreed that mother continued to be somewhat dependent on her extended family, but testified that there is nothing inherently dysfunctional, inappropriate, or harmful to children in a situation where the parent is so enmeshed with her family; indeed, his view was that children were best served in an extended family setting. He stood by his opinion that mother would be able to parent her child successfully with the help of her family.
Mother testified about her day-to-day life at the time. She testified that she continued to provide care for her aging grandmother and to babysit for other women's children. She testified that she would soon be graduating from the computer training course and that she was confident about her job prospects. She testified that she had a two-bedroom apartment across the alley from her parent's house, but that she only saw grandmother when she worked with her.
Among other things, mother also testified that she sought prenatal care in Stayton, Oregon, not in Salem where she lives, because she does not trust the doctors in Salem after her "really bad experience" with them. In response to questioning, she stated that if the baby broke his leg, she would take him to the hospital in Stayton, even though it was farther away, but if he suffered from a life-threatening condition, she would take him to the closest hospital in Salem.
Finally, mother maintained at the termination trial that DHS had had no reason to get involved with the first child at his birth, despite the bizarre stories about his conception, because, she said, there are many people with worse problems than hers, such as drug addicts with children, that deserve the state's attention.
In March 2003, the trial court sent a letter to the parties explaining that it had decided to terminate mother's parental rights to the second child as well. The court began by acknowledging that, because mother does not have an alcohol or substance abuse problem, has no criminal record, and was finishing a course of schooling that should enable her to be gainfully employed, this was a difficult *638 case, lacking the aggravated or extreme circumstances often seen in other termination cases. The court also prefaced its ruling by noting that it declined to proceed under ORS 419B.502, which permits termination on the ground of "extreme conduct," notwithstanding that having had one's parental rights terminated previously constitutes extreme conduct under the statute, because the earlier case was then on appeal.
Instead, the court stated, it based its decision on ORS 419B.504, which provides, in part:
"The rights of the parent or parents may be terminated as provided in ORS 419B.500 if the court finds that the parent or parents are unfit by reason of conduct or condition seriously detrimental to the child * * * and integration of the child * * * into the home of the parent or parents is improbable within a reasonable time due to conduct or conditions not likely to change. In determining such conduct and conditions, the court shall consider but is not limited to the following:
"(1) Emotional illness, mental illness or mental deficiency of the parent of such nature and duration as to render the parent incapable of providing proper care for the child * * * for extended periods of time."
The court found that the state failed to prove that mother suffered from an emotional or mental illness, but "[t]he question of whether mother suffers from a `mental deficiency' is another matter." The court stated that, although mother had received virtually all the services and assistance the state has to offer, she either could not or would not accept "`suggestions' by DHS staff on how to better interact with her child." Moreover, "[a]lthough mother seems to be able to function adequately on a daily basis, there appears to be something `missing' from her makeup."
The court, accordingly, found that mother did suffer from a "mental deficiency." The court reached that conclusion based on three excerpts from her testimony, which the court conceded otherwise was, for the most part, "quite appropriate." Those three instances were (1) that mother continued to believe that DHS was wrong to take her first child away from her, in light of the outrageous story she told about the child's conception; (2) that mother testified that she would take her son to a certain hospital outside of Salem, unless it were a life-threatening emergency, because she trusts the doctors there more;[13] and (3) that mother did not demonstrate the level of emotion or sadness that the court expected of her when she testified that, on her lawyer's advice, she had not seen her second son for the first six weeks of his life.
Based on the foregoing, the court found that the state had established, by clear and convincing evidence, that mother was unfit by reason of her mental deficiency and that mother's parental rights should be terminated. Three weeks later, the court entered a judgment terminating mother's parental rights to the second child.[14]
*639 Mother appealed to the Court of Appeals both trial court rulings terminating her parental rights. As noted, in the first case, a divided en banc Court of Appeals affirmed the termination in a brief, per curiam opinion. The majority concluded that the law is well established, neither party had argued that the trial court misstated the law, and further discussion would not benefit anyone. Smith I. The dissenting judges agreed that the case involved the application of well-established legal principles to unique facts, but did not agree that the facts met the standard necessary to terminate mother's parental rights to child. Id., 190 Or.App. at 571, 79 P.3d 374. The Court of Appeals later affirmed the second termination in a per curiam opinion citing its earlier decision with respect to the first child. Smith II. Judges Landau and Armstrong concurred, stating that, in their view, the state failed to establish the requirements for termination by clear and convincing evidence, but that they were bound by the court's earlier decision in Smith I. Id., 191 Or.App. at 138, 80 P.3d 522.
The parties agree that, because the facts of the two cases are so intimately intertwined, our decision with respect to the first child largely will dictate the outcome of the second case. That is, if we decide that the evidence is insufficient to support termination of mother's parental rights as to the first child, then the trial court's ruling with respect to the second child also cannot stand. Accordingly, we focus our analysis and review on the trial court's ruling regarding mother's parental rights to the first child.
We begin by reviewing the role of the court in these matters and the standard of review that the statute directs us to employ. ORS 419B.500 authorizes a court to terminate a parent's parental rights for the purpose of freeing a child for adoption if the court finds that that is in the child's best interest. However, as this court stated in State ex rel. Juv. Dept. v. Geist, 310 Or. 176, 189 n. 15, 796 P.2d 1193 (1990), "[e]ven if a court determines that a child's best interest will be served by a termination of parental rights, it may not be ordered unless the statutory grounds for termination have been established by clear and convincing evidence." (Emphasis in original.) That "clear and convincing" evidence standard is set out in ORS 419B.521, which provides that "[t]he facts on the basis of which the rights of the parents are terminated, unless admitted, must be established by clear and convincing evidence." Under that standard, the court must find that the evidence establishes that the truth of the facts asserted is highly probable. See In re Kluge, 335 Or. 326, 342 n. 12, 66 P.3d 492 (2003); In re Cohen, 316 Or. 657, 659, 853 P.2d 286 (1993); Zockert v. Fanning, 310 Or. 514, 526, 800 P.2d 773 (1990) (all discussing meaning of standard).
The statutory grounds for terminating parental rights include a finding that the parent is unfit by reason of a single or recurrent incident of extreme conduct toward any child, ORS 419B.502; that the parent is unfit by reason of conduct or a condition seriously detrimental to the child and integration of the child into the parent's home is improbable within a reasonable period of time due to conduct or condition unlikely to change, ORS 419B.504; that the parent neglected the child, ORS 419B.506; or that the parent abandoned the child, ORS 419B.508.
In Smith I, the state contended that termination of mother's parental rights as to the first child was appropriate under ORS 419B.504, which provides, in part:
"The rights of the parent or parents may be terminated as provided in ORS 419B.500 if the court finds that the parent or parents are unfit by reason of conduct or condition seriously detrimental to the child * * * and integration of the child * * * into the home of the parent or parents is improbable within a reasonable time due to conduct or conditions not likely to change. In determining such conduct and conditions, the court shall consider but is not limited to the following:
"(1) Emotional illness, mental illness or mental deficiency of the parent of such nature and duration as to render the parent incapable of providing proper care for the child * * * for extended periods of time.
"* * * * *

*640 "(5) Lack of effort of the parent to adjust the circumstances of the parent, conduct, or conditions to make it possible for the child * * * to safely return home within a reasonable time or failure of the parent to effect a lasting adjustment after reasonable efforts by available social agencies for such extended duration of time that it appears reasonable that no lasting adjustment can be effected."
As this court observed in Stillman, 333 Or. at 145, 36 P.3d 490,
"ORS 419B.504 sets out a two-part test for determining whether to terminate parental rights, both parts of which must be met before the court orders termination. First, the court must address a parent's fitness: The court must find that the parent is `unfit by reason of conduct or condition seriously detrimental to the child.' That, in turn, requires a two-part inquiry: The court must find that: (1) the parent has engaged in some conduct or is characterized by some condition; and (2) the conduct or condition is `seriously detrimental' to the child. Second  and only if the parent has met the foregoing criteria  the court also must find that the `integration of the child into the home of the parent or parents is improbable within a reasonable time due to conduct or conditions not likely to change.'"
The court in Stillman also looked at the statements of legislative policy in the statute and concluded that the focus of both parts of the test for termination in ORS 419B.504 "is on the detrimental effect of the parent's conduct or condition on the child, not just the seriousness of the parent's conduct or condition in the abstract. Thus, the court first must identify the parent's conduct or condition, and then measure the degree to which that conduct or condition has had a seriously detrimental effect on the child." Id. at 146, 36 P.3d 490.
The petition to terminate mother's parental rights to the first child alleged the following "conduct or conditions" justifying termination:
"a) Lack of effort or failure to obtain and maintain a suitable or stable living situation for the child so that return of the child to the parent is possible.
"b) Failure to present a viable plan for the return of the child to the parent's care and custody.
"c) Failure to learn or assume parenting skills sufficient to provide for the safe and proper raising of the child.
"d) An emotional illness, mental illness, or mental deficiency of such nature and duration as to render the parent incapable of providing care for extended periods of time.
"e) Lack of effort to adjust the parent's circumstances, conduct or conditions to make return of the child to the parent possible."
The state's evidence in support of those allegations can be summarized as follows: mother refused to comply with DHS's demand that she find "suitable" housing independent of her family; mother was mentally "deficient," insofar as she was of low-average IQ, she lied and told outrageous stories, she was unusually dependent on her extended family, and she refused to concede that the state acted properly in taking the child away from her; and, finally, mother made no progress in developing parenting skills and never learned to interact with the child in any of the ways that the agency's personnel thought necessary.
We accept for purposes of this opinion that the foregoing evidence, if established, might provide, either individually or collectively, a basis for finding the existence of a "condition" of the kind that may justify termination of parental rights under ORS 419B.504. The question becomes whether, to the extent that the alleged circumstances truly exist, they demonstrate clearly and convincingly that mother's condition was "seriously detrimental" to the child so as to warrant a finding of unfitness.
We turn first to mother's unwillingness to find "suitable" housing independent of her parents' home. As noted above, the chief complaints of DHS about the grandparents from the beginning of the case until the termination hearing were that the grandparents from time to time had permitted sex *641 offenders into their home; that they were the foster parents of a 14-year-old boy who had had a history of acting out sexually with younger children; and that they were hostile, aggressive, and disrespectful toward agency employees and refused to acknowledge that the agency was correct to interfere with the family.[15] The primary complaint about the apartment that mother eventually rented, apart from the fact that it was too close to the grandparents' home, was that it was "trashy looking" and "low income" and that sex offenders lived in the neighborhood. None of those facts establishes that it is highly probable that the grandparents' home or mother's new living situation nearby would be seriously detrimental to the child.
The fact that sex offenders live in the neighborhood, or even that they have visited the grandparents' home on occasion, is not, without more, evidence of a condition seriously detrimental to the child. The state presented no evidence whatsoever that any child ever had been harmed in the grandparent's household. Nor did the state present any evidence that would suggest that mother's child would not be safe in the grandparents' home in the future because sex offenders previously had visited them.
Moreover, and even if we were to agree that the mere fact that one or more sex offenders had visited mother's or grandparents' home on occasion in the past would constitute a "condition seriously detrimental to the child," the fact remains that, to support termination under ORS 419B.504, the condition had to render the parent unfit at the time of the termination hearing. Stillman, 333 Or. at 148, 36 P.3d 490. The evidence at the first termination hearing was undisputed that both men that DHS was concerned about had died long before that time. In addition, the foster son long since had moved out. There simply is no evidence in the record that the family's earlier relationship with two sex offenders, or the foster child for that matter, would be seriously detrimental to the child.
DHS criticized the family for being hostile to the agency because of a continuing disagreement over the propriety of removing the child from mother's care and for fostering that attitude in mother. DHS asserted that grandmother was verbally abusive to DHS workers during meetings and witnesses claimed that she frequently glared at the foster family in ways that made them feel uncomfortable and threatened. DHS further asserted that grandfather was angry and disengaged toward DHS during visitations. Mother's brothers repeatedly stated that they could not understand why mother was not allowed to have the child. According to DHS, mother herself was more aggressive when her parents were present and repeatedly waited for her rides in front of a store near the agency facility where the foster family would have to see her. The family generally was distrustful of the agency and accused social workers of changing and misconstruing court orders.
Clearly, the family's challenges to DHS's authority to retain custody of the child engendered a hostility between the agency and the family that permeated the case. However, we cannot permit that hostility to divert us from the proper focus of the case, viz., the child's safety and welfare. DHS, for its part, appears to have adopted, and retained throughout the proceeding, the view that the family's and mother's attitude demonstrated a lack of insight justifying the state's continued retention of the child, and, ultimately justified termination of mother's parental rights. Our problem with that line of reasoning is that, however difficult mother and her family were for DHS to work with because of their hostility to the agency, the existence of that hostility did not, without more, constitute evidence of a condition seriously detrimental to the child.
Although many DHS witnesses characterized the family's demeanor as "threatening," the witnesses appear to be characterizing the family's attitude toward them, not the child. *642 The state presented no evidence that the grandparent's home was an abusive environment or would be dangerous for the child. By the time of the termination hearing, the grandparents had been married for about 35 years and had raised four children, and no one in their household ever had come to harm. We also note that all members of the household continuously had been gainfully employed, and none apparently ever had been convicted of any crime. In addition, the state had certified the grandparents as foster parents for a 14-year-old neighbor boy.
Nor are we prepared to say that the fact that the apartment complex where mother eventually rented her apartment was "trashy looking" or "low income" rendered her living situation seriously detrimental to the child. The record reflects that the inside of mother's apartment was clean, comfortable looking, and appropriately furnished. Moreover, mother's monthly income was between $800 and $1,200. She could hardly be expected to be able to afford an apartment that was not "low income" at that level. And, of course, mother would not have had to move out of her parent's larger house at all if not for the agency's unreasonable demands.
As is evident from the foregoing, the state's objection to the child living with the mother in or near the grandparents' home was central to its case. But that is a disagreement over lifestyle, not safety. Nothing in the state's evidence demonstrated that living in or near the grandparents' home would be "seriously detrimental" to the child. Having failed to establish those facts, it follows that the state failed to meet its statutory burden. Put differently, mother's failure to "adjust her circumstances" by finding "suitable housing" more independent of her parents was not clear and convincing evidence of a "condition seriously detrimental to the child" under ORS 419B.504.
The state also contended that mother was unfit because of an emotional or mental illness or mental deficiency that rendered her incapable of caring for the child. Neither psychologist who evaluated mother conclusively diagnosed her with either an emotional or mental illness. Instead, the state presented evidence that mother suffered from a "mental deficiency" manifested by her low-average IQ, her lies and outlandish stories, her dependence on her family, and her failure to concede that the state acted properly in taking the child away from her. The evidence with respect to all the foregoing was overwhelming. However, the state presented no evidence that mother's mental deficiency, as so manifested in certain situations, was seriously detrimental to the child.
We already have discussed the fact that mother's failure to acknowledge the propriety of the agency's actions was not a condition seriously detrimental to the child. We also think that mother's attitude was not entirely unreasonable, particularly in light of the fact that that view was shared by the first psychologist who evaluated mother and by mother's counselor. Furthermore, both psychologists who evaluated mother for DHS acknowledged that mother's low-average IQ, in itself, was not necessarily a condition seriously detrimental to the child.
In addition, this court has stated that evidence of a mother's evasive or untrue answers to questions during a termination proceeding is insufficient to permit the court permanently to sever the ties between parent and child. See State v. Easley (Hull), 228 Or. 472, 473, 365 P.2d 293 (1961) (stating principle); Cutts v. Cutts, 229 Or. 33, 43, 366 P.2d 179 (1961) (fact that father willfully worked fraud upon court by failing to reveal all pertinent facts to lawyer during divorce case was collateral misconduct that was not "sufficient ground to constitute the kind of depravity required to invoke the provisions [of the termination statute] "). In this case, the state has not pointed to any untruthfulness on mother's part that concerns matters that are central, or even related, to her ability to care for the child. In the circumstances, the state has not presented clear and convincing evidence that mother's tendency to lie or tell outrageous stories is a condition seriously detrimental to the child.
Finally, the state has not proved by clear and convincing evidence that mother's dependence on her family is a condition seriously detrimental to the child. At the outset we observe that there is no statutory *643 requirement that a parent be able to care for the child "independently." All that ORS 419B.504 requires is that the parent's inability to parent the child independently not work to the detriment of the child. See Stillman, 333 Or. at 152, 36 P.3d 490 (state failed to show by clear and convincing evidence that father's condition of incarceration on drug offense was seriously detrimental to children so as to warrant finding of unfitness, where strong family support prevented children from suffering serious detriment from father's inability to parent children during that time). Here, there is nothing in the record to suggest that mother will be unable to obtain any assistance she needs in raising her child from her family. And given our earlier conclusion that none of the state's objections to mother's family demonstrate that mother's family would pose a threat to the child, we cannot conclude, on this record, that mother's dependence on her family amounts to a condition seriously detrimental to the child under ORS 419B.504.
The final, and perhaps the most serious, charge relating to mother's fitness is that she made virtually no progress in developing parenting skills and never learned to interact with the child in any of the ways that the agency thought necessary or appropriate.
That argument arises from the specific observations of DHS workers during visits by mother with the child. The principal criticism of mother pertaining to her visits with the child was that mother did not interact "appropriately" with the child. She did not make the visits enjoyable for the child, the child seemed bored rather than animated, mother did not make proper eye contact with the child, and she did not respond appropriately to his "cues." In addition, mother refused to read the parenting books provided to her and lacked "insight" as to the importance of the various skills that had been taught to her in parenting programs.
We agree that evidence of mother's conduct during visitations did not flatter her. Certainly, we also agree with the state that mother did not interact with the child at a level that would ensure that the child necessarily will experience maximum emotional development. However, the deficiencies perceived here are not so severe as to implicate the standard that the statute sets out for the termination of parental rights and likely are no worse than those of thousands of Oregonians who ultimately succeed, without state intervention, in raising their children safely.
Given mother's limitations, perfection in parenting is not attainable (if it is for anyone), but neither is it required. For more than two years, despite her recognized intellectual and social skills deficits, mother participated regularly in programs required by DHS and religiously attended weekly visits with the child. The testimony of DHS workers observing the visits confirmed that mother played with the child with toys, although she did not offer him a variety from among the wide assortment of educational toys available, and that the child went to mother willingly, laughed when mother took his picture, and clung to her when he felt frightened. The child never was injured or in any danger during her visits. And, the evidence was undisputed that mother had provided childcare for many children over the years with no complaints. In contending that, notwithstanding the foregoing, mother is so inadequate as a parent that her condition is seriously detrimental to the child, DHS has attempted to impose a standard on mother that the statute does not contemplate. See State v. McMaster, 259 Or. 291, 302-03, 486 P.2d 567 (1971) (under previous version of statute, when legislature used phrase "seriously detrimental to the child" it had "in mind a more serious and uncommon detriment" than that caused by the parents' inability "to furnish surroundings that would enable child to grow up as we would desire all children to do").
Based on our foregoing review of the record in the Smith I case, we hold that the state has failed to show, even when its evidence is considered and weighed collectively, that any conduct or condition of mother is seriously detrimental to the child. In the absence of such evidence, the state has failed to establish that mother is unfit under ORS 419B.504. It follows that the trial court order terminating mother's parental rights to her first child was error. *644 As noted, the complete record of the first termination proceeding was admitted at the second termination proceeding. The testimony and exhibits entered into evidence at the second trial were similar in tone and content to that of the first. Based on that evidence, the trial court terminated mother's parental rights as to the second child as well.
Our review of the record in the second case discloses that the state presented no different evidence that mother's condition was seriously detrimental to the second child. We also observe that none of the factors that the trial court cited in the second case in its letter explaining its ruling, whether taken separately or together, constitute clear and convincing evidence supporting that court's conclusion that mother is unfit. We already have discussed at length the fact that mother's continuing disagreement with the removal of the first child by DHS does not demonstrate her unfitness. Likewise, mother's testimony that she trusts doctors in Stayton more than in Salem and would therefore take her injured baby to a hospital there unless the injury were life-threatening seems understandable, and certainly is not clear and convincing evidence of her unfitness. The trial court's perception that mother did not display a sufficient level of emotion over the fact that, on her lawyer's recommendation, she did not see her child for the first six weeks of his life does not clearly and convincingly establish any condition "seriously detrimental" to the child. Finally, we reject the trial court's conclusion that mother suffers from a "mental deficiency." There was no expert testimony to that effect. Instead, the trial judge appears to have drawn his conclusion from mother's responses to his questions at the hearing. That is not an appropriate way to make such a determination. It follows that the trial court's action terminating mother's parental rights to the second child in Smith II also was error.
The decisions of the Court of Appeals are reversed. The judgments of the circuit court are reversed, and the cases are remanded to the circuit court for further proceedings.
RIGGS, J., dissented and filed an opinion.
RIGGS, J., dissenting.
These cases present a twofold problem. The first is the competency of mother to parent  to nurture and protect her children. The second is whether, lacking that ability, mother reasonably can rely on external support, in this case the extended family, to provide all that she is unable to provide. Because I believe that mother lacks the ability to parent, and because I also believe that the extended family appears hostile to almost any level of outside supervision, I cannot join an opinion that has the potential of returning these children to that environment. I, therefore, respectfully dissent.
We allowed review in these cases and, as we have the authority to do, have chosen to base our review on a de novo consideration of the facts. However, I believe that the majority's findings of fact on de novo review unfortunately omit or at least partially ignore the significance of, and reasonable inferences that flow from, the important expert testimony of Dr. Sweet. In his testimony, Sweet made a number of clinical psychological observations concerning mother following the administration of several well-known standardized tests, including the Wechsler Adult Intelligence Scale Third Edition (WAIS-III), the Thematic Apperception Test, and the Minnesota Multiphasic Personality Inventory-2 (MMPI-2).
Without belaboring Sweet's clinical findings, the following testimony highlights some of my concerns about mother's ability to parent. In response to questions regarding mother's performance on the MMPI-2, Sweet stated:
"She responded to this test in a very defensive manner. I expect some defensiveness because, you know, these are critical issues. People want to make sure that they look pretty good. You know, their child is in jeopardy here, but this is an extremely defensive profile. What happens with those kinds of profiles is it under-reports problems, people aren't really being open and honest. * * * You may see her respond appropriately in situations but there is a potential for her to *645 overreact inappropriately and even aggressively.

"* * * * *
"I diagnosed her with borderline intellectual functioning. I have a strong suspicion that she has a dependent personality disorder * * *."
"* * * * *
"[T]hese * * * are people that are looking to have their own dependency needs met first * * * as opposed to vice versa where the parents really should be very alert to the children's needs and focus on their needs first."
(Emphasis added.)
When discussing what a conclusive diagnosis of dependent personality disorder would reveal about mother's parenting abilities, Sweet testified that
"Well, people can function but they typically rely on other people, spouse, family, close friends, for a lot of their decision-making, even on an everyday basis. * * * So that's why I've got some concerns about whether that problem exists because that could have a very adverse impact on her relationship with her son."
(Emphasis added.)
It is true that Sweet did not make an actual diagnosis of dependent personality disorder and, as the majority describes, he acknowledged that mother could provide basic child care needs under the tutelage or supervision of others, presumably the extended family. Nevertheless, Sweet emphasized his concerns about mother's ability to provide for her children's safety:
"Q. Is your concern about safety issues based solely on one report about an inappropriate toy?
"A. No. I'm concerned about her judgment and her ability to learn * * * about what the kids need * * *."
The majority opinion describes adequately other concerns about mother's connection with reality in its discussion of the circumstances surrounding mother's first pregnancy and the vehement claims by her and her parents that she was a virgin or that she was not pregnant. Both mother and grandmother went so far as to claim to their doctor that mother could not be pregnant because she was continuing to menstruate. 338 Or. at ___, 106 P.3d at 630. Even when she went to the hospital, with her mother, to deliver her child, mother continued to claim to the nurses that she was a virgin, or later, that she might have become pregnant by taking a bath. 338 Or. at ___, 106 P.3d at 630. Sadly, and with as much charity as can be mustered in these circumstances, mother is profoundly incapable of understanding reality, making it impossible for her to make appropriate decisions regarding the nurture and safety of her children.
That brings me to my second concern: Notwithstanding mother's profound inadequacies and almost total dependence on her family, are the children nevertheless safe and will they receive proper nurturing with the help of extended family?
The inferences and result of the majority's findings of fact conclude that, after approximately three years in adoptive placement, these children will return to an untruthful or delusional mother who is almost totally dependent on her own parents to care for her children. Because of the hostile views toward state authorities that mother and her parents expressed, there is little hope that any state protective agency will be able to provide supervision and assistance for the children. I cannot conclude that that environment will meet even the most minimal safety concerns for the children.
I recognize the possibility that a state agency could become heavy-handed in its supervisory role. I also recognize that supervised clients of a state agency justifiably could become resentful about the imposed rules and expected conduct in settings like these. Nonetheless, I believe that Oregonians expect the state to move to protect children at risk, especially when parents and extended families resist taking reasonable steps toward providing a safe and nurturing home environment.
I would affirm the Court of Appeals decision and, therefore, respectfully dissent.
NOTES
[1] It later came to light that, late one night, while mother was babysitting a friend's children, a family friend came to visit and propositioned her for sex. Mother claimed that she became woozy from cigarette smoke and consented. She further claimed that she never had had sexual relations before. Finally, mother claimed that the friend did not fully penetrate her, and that is why she believed that she was still a virgin.
[2] Mother's parents routinely permitted neighborhood men who were on probation or parole and who did not have a place to shower before meetings with probation or parole officers, doctor appointments, court hearings, and the like, to shower at their house.
[3] Mother's parents were the foster parents of a 14-year-old neighbor boy who had a history of sexually acting out with younger children. Mother's parents were not supposed to permit sex offenders to come into contact with him. In addition, Ruston was not permitted to come into contact with minors.
[4] Mother never directly suggested that her foster brother might have been the child's father; once mother stopped insisting that she was a virgin, she consistently named another man as the father. The only explanation in the record for Bradley's statement is that mother implicated the foster brother, among others, in early versions of the "conception by masturbation" story. However, Bradley's statement regarding the foster brother was then repeated on numerous occasions in various official reports in the case.
[5] Each visit lasted approximately an hour and a half.
[6] At the termination trial, evidence was presented that Ruston had disappeared before mother gave birth and that he had died some time earlier.
[7] For example, mother had said she was Native American, but when pressed for information about tribal membership, she simply repeated "six tribes" over and over. (Mother is not officially a member of any tribe, and the Indian Child Welfare Act does not apply to this case.) She stated that six attorneys had told her she could register at the hospital under her mother's name. She reported that she had called six doctors about prenatal care after she found out she was pregnant, but none would see her.
[8] At the permanency hearing in April 2002, both Sanders and another DHS worker testified that the agency wanted mother to obtain independent housing because the family was hostile and it appeared that mother herself was more assertive and less malleable when her family members were present.
[9] Mother's lawyer apparently advised her not to sign the agreements because of the independent living requirement.
[10] Contrary to the agency's wishes, however, mother rented an apartment in the complex that grandmother managed, adjacent to grandparents' home.
[11] Mother did seek and obtain prenatal care after the termination trial.
[12] In February 2003, the state filed a First Amended Petition To Terminate Parental Rights, which superseded the November 2002 document.
[13] The court found that answer to be "astounding and even frightening" and stated that it was "a very stark illustration of when [mother] would put her own interests (she distrusts Salem doctors) ahead of the interests of her child."
[14] The judgment recited that:

"2. The mother is unfit by reason of the following extreme conduct toward another child, to wit: previous involuntary termination of the mother's rights to the [first] child * * * and the conditions giving rise to the previous action have not been ameliorated.
"3. The mother is unfit by reason of conduct or condition seriously detrimental to the child and integration of the child into the mother's home is improbable within a reasonable time due to conduct or condition not likely to change, including the following:
"a) Failure to learn or assume parenting skills for child's sibling * * * sufficient to provide for the safe and proper raising of this child.
"b) A mental deficiency of such nature and duration as to render the parent incapable of providing care for extended periods of time.
"c) Lack of effort to adjust the parent's circumstances, conduct or conditions to make return of the child's sibling * * * to the parent possible and said failure to materially benefit from previously proffered services designed to remediate her parenting deficiencies renders mother unable to parent this child.
"4. It is in the child's best interest that the mother's parental rights be terminated and the child be freed for adoption."
[15] One of the state's witnesses suggested in passing at a hearing on the matter that the grandparents were not an appropriate placement resource because they had been receiving public assistance fraudulently. The state made no other effort to establish the truth of that statement, and in any event, the record is devoid of any link between that fact, even if it were true, and any harm that might come to the child from it. Accordingly, we do not consider it.