Argued and submitted May 8, affirmed September 6, 2006

In the Matter of
Ryan Seale, Peter Seale,
Anthony Seale, and Jacup Seale,
Minor Children.

STATE ex rel DEPARTMENT OF HUMAN SERVICES,
*Respondent,*

*v.*

York E. SEALE,
aka York Eldon Seale,
*Appellant.*

98502J, 98503J, 98504J, and 98505J; A130704

142 P3d 520

Daphne E. Mantis argued the cause and filed the brief for appellant.

Brendan C. Dunn, Assistant Attorney General, argued the cause for respondent. With him on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Ortega, Presiding Judge, and Landau,* Judge, and Murphy, Judge pro tempore.

ORTEGA, P. J.

---

* Landau, J., *vice* Brewer, C. J.

## ORTEGA, P. J.

Father appeals from a juvenile court judgment terminating his parental rights to his four sons: R, J, A, and P. Father acknowledges that, because of mental deficiencies arising from a serious head injury, he cannot provide proper care for the children and that his condition is unlikely to change. However, he contends that, instead of terminating his parental rights, the juvenile court should have ordered that the children remain in their foster care setting and have supervised contact with him. We review *de novo*, ORS 419A.200(6)(b), and affirm.

We begin with a brief chronology of the family history before turning to a more detailed examination of the record. R was born in 1991; J, in 1994; A, in 1996; and P, in 1998. In November 1998, the children were taken into the custody of the Department of Human Services (DHS)[1] following reports of violence by father. The children were initially placed with mother, but, in January 2000, they were moved to foster care after DHS received reports of domestic violence. Eventually, mother and father separated permanently. Father had supervised visits with the children beginning in July 2000 and ending about a year later. In July 2002, father had an accident resulting in severe head injuries and continuing medical and mental conditions. The trial concerning the termination of father's parental rights took place in September 2005. Mother relinquished her parental rights and is not a party to this appeal.

With that overview in mind, we turn to a more detailed examination of the facts, beginning with the family history and then turning to evidence regarding the children's emotional health. This examination is necessary to explain our conclusions regarding father's present unfitness, in the face of his arguments that he no longer presents a danger to the children; to address why his current condition presents a serious detriment to the children; and to explain why termination is in their best interests.

---

[1] DHS was formerly known as SOSCF or SCF. Throughout this opinion, we use the current name.

Mother met father when she was "[a]lmost 15," and they began a sexual relationship when she "[p]robably was 16" and father was 22. They began living together two years later, after their oldest son, R, was born, and lived together for eight or nine years. Father was abusive to mother, striking, choking, and punching her on numerous occasions. Once he knocked out mother's teeth, and she now wears false teeth as a result. On another occasion, mother returned home from work and asked father how his day was; he "freaked out" and threw her down, fracturing her ribs. Once he threw a large television set at her. Father not only called mother vulgar names but also told R when he was quite young to call mother "a bitch and a whore." Father also forced mother to have sex with him when he was drunk. When asked how often father got drunk, mother stated that originally "it didn't seem like it was that much. But as the years went by it was constantly."[2]

According to mother, all of the children were present during incidents of domestic violence, but R, being the oldest, was most aware of the violence. R once called the police because of father's violence toward mother. Mother obtained restraining orders against father, but the orders were ineffective. She explained, "There were times I was dumb enough to let him back and times that he would take my windows out of my apartment and just break in." Mother testified that, since the end of their relationship, she has moved repeatedly and has taken precautions against the possibility that father might locate her.

Mother testified that father also was abusive toward the children. Because she worked while father was home with the children, she did not personally observe the incidents, but she testified that the children have since told her about such abuse, including father's grabbing R's neck and

---

[2] While mother and father were together, both of them abused drugs and alcohol, but mother has since undergone treatment. Although father characterizes mother as an equal participant in the violence between the two, her testimony was that she probably "hit him back at some point." As the juvenile court found, "it's an entirely different quality or level of abstraction in terms of her trying to fight back or do something to protect herself dealing with him, and his assaults against her which apparently have resulted in permanent injury."

squeezing. Father, for his part, insists that he was never violent toward the children, and father's parents, James and Monica,[3] testified to their belief that father and the children got along well and that the children do not fear father. According to Monica, father was not abusive toward the children but, in fact, was too lax in disciplining them.

Father acknowledged that there had been "violence around" the children but denied that there had been "[v]iolence to them[.]" When asked if he had beaten mother in the children's presence, father replied, "No, not in front of them. There was that one incident where I smacked her on the butt, you know, that's—that's that one incident. But I've never pummeled her, you know, like manhandled her, like you would a man in front of the children, no." Like the juvenile court, we do not find father's denials of domestic violence credible. Indeed, father acknowledged that he had been convicted of felony assault for domestic violence against mother in the presence of the oldest child. Actually, father had two such convictions, one in 1996 and one in 1998.

In November 1998, McGory, then a DHS intake worker, received a referral regarding the children. He interviewed J and R separately. J, then four years old, had a cut on his ankle, which he reported was caused by his father spanking him with a belt that had a nail in it. R, then seven, likewise reported that he had seen father spank J with a belt the previous evening and that, indeed, father singled J out for more spankings than the rest of the children. R also reported that he had seen father knock out mother's teeth and pull a gun on her. When McGory spoke with father about the children's reports, father denied living with the family and spanking the children with a belt. However, R, J, and the apartment manager all independently confirmed that father was living with mother and the children. Father's probation officer took him into custody, and the children were left in mother's care.

---

[3] The record includes testimony by father's mother, father, and sister. Because they all share the last name Seale, we refer to them by their first names.

DHS then filed a petition for juvenile court jurisdiction. After a shelter hearing, the juvenile court ordered that the children be temporarily committed to DHS custody; that they be placed with mother, subject to conditions; and that father have visitation only as authorized and supervised by DHS. In January 1999, the juvenile court took jurisdiction over the children.

In September 1999, the juvenile court again ordered that father visit the children only as authorized and supervised by DHS. However, in January 2000, R's teacher reported to DHS that R had told her that father had returned to the family home, although he was not supposed to be there, and that he had choked mother. A DHS caseworker, Wharfield, spoke with R, who reported that father had grabbed mother around the neck and thrown her outside. J, in a separate interview, gave the same report and also described an incident when father tried to spank him with a belt. When Wharfield and McGory went to mother's home, mother admitted that father was there, and the caseworkers removed the children from mother's care.

At first the children were placed in a nonrelative foster home, but three months later they were placed with their maternal grandmother.[4] Grandmother testified that, when the children first came to live with her, they were "really upset." The children expressed a desire to have weapons, particularly knives. They had nightmares, became very afraid at the slightest provocation, and would cry or scream in fear that father was breaking into the house, as he often had done when they were living with mother. Grandmother described occasions when she found the children "all huddled in the older boys' room * * * under the window, all four of them in a little pile together, and that was really heartbreaking." Grandmother testified that the children were frightened by "just everything that had happened around them and to them" and that R felt responsible for protecting his younger brothers. Indeed, grandmother reported that throughout the five years that the children had been living with her, R had

---

[4] Because mother and her mother have very similar names, we refer to mother's mother as "grandmother" to avoid confusion.

gone around the house with her every night to double-check that the doors and windows were all locked.

For a period of time after the children were removed from mother's care, Wharfield could not find father. Eventually she learned that he was in jail, and she visited him there in June 2000 to provide him with a letter of expectation. Among other expectations, the letter noted that father needed to keep DHS informed of his contact information and to maintain supervised visits with the children.

The following month, father began having supervised visits with the children. Early on, J expressed to Wharfield his fear that father would hurt them and appeared to be "conflicted about being fearful of dad and yet at the same time wanting to visit" with him. During one of father's visits, R "spontaneously blurted out to dad, * * * Why do you beat up our mom?" Father did not respond to R's question or accept the direction Wharfield offered about addressing the children's fears.

Although DHS went over visitation guidelines with father at the first visit, father failed to comply with those guidelines. After father repeatedly arrived late or failed to show up for visits, DHS instructed him to call on the day of each visit to confirm that he was coming, but he did not comply with those instructions. According to mother, the children felt abandoned by father's failure to show up for visits.

In February 2001, 13 months after the children entered foster care and more than two years after the juvenile court took jurisdiction, the court relieved DHS of the obligation to work toward reuniting the children with their parents. Father had not made any progress toward showing that he could meet the children's emotional and safety needs and had not complied with DHS's requests that he engage in drug and alcohol treatment and domestic violence counseling.

That same month, after some unpleasant visits, R and J (the two oldest boys) began to refuse to attend any more visits with father, even hiding from grandmother in order to avoid visits. Father stopped attending visits altogether two months later, and DHS terminated all further visits a few months after that, in July 2001. After the visits with father

stopped, the children did not express any desire to see him nor, at the time of trial, were they expressing any desire to do so, although R (age 14 at the time of trial) expressed a desire to tell father what he thinks of him, "which isn't much."

The children's visits with Monica and James were suspended around the same time, in June 2001, after the children reported that father had been present during those visits and that the children had been told to keep his presence secret. Although Monica and James testified that father was never around when the children visited their home, a teenage friend of the family corroborated the children's report of father's presence.

For the first two years that the children were in foster care, father lived with a girlfriend and her two children. According to uncontradicted evidence in the record, father slapped, punched, and shoved his girlfriend in front of her children, primarily when he was drinking or using drugs. He also kicked in doors, burned one of the children with a cigarette lighter while joking that he was giving her a "hot seat," and, while manufacturing methamphetamine, caused a fire while two of the children were in the house. On the day before father finally moved out, his girlfriend came home from work to find him in bed naked with her 15-year-old daughter.[5] The girlfriend obtained a restraining order against him in late April 2002.

Two months later, father sustained a 40-foot fall from a tree while he was intoxicated, resulting in severe head injuries and ongoing medical and mental problems. Since that time, except when he has been incarcerated, he has lived with his parents because he cannot work or take care of himself. Father testified that his "whole frontal lobe" was destroyed during the accident and that, as a result, he has short-term memory loss. He explained, "I'll remember things, and then like a day or so later it's gone." Because of his injuries, he sometimes forgets putting something on the stove, so that a couple of Monica's pots have been "burnt to a crisp." Father is no longer allowed to use the stove because of the

---

[5] At the time of the termination trial, father was in jail awaiting trial on charges of third-degree rape, furnishing alcohol to a minor, and contributing to the sexual delinquency of a minor, all arising from his contact with the 15-year-old.

risk that he could start a fire. Monica testified that doctors have indicated that, "if he gets a bump on his head, it can kill him." Nevertheless, both father and his parents identify the accident as a kind of turning point. His parents testified that he has become a different person and no longer engages in wild behavior, drinking to excess, or using illegal drugs.

About six months after the accident (and more than six months after his last visit with the children), father again sought permission to resume visits, but the juvenile court again ordered that there should be no contact between father and the children. Initially, although it had been relieved of the obligation to make efforts to reunite the family as of February 2001 (months before father's accident), DHS did not immediately proceed with a plan for adoption, because the children needed such intensive services.[6] A petition to terminate father's parental rights finally was filed in November 2004, and mother relinquished her rights that same month. Trial was originally scheduled for June 2005, but father had to have surgery that month because his spinal fluid was leaking and causing recurrent episodes of meningitis.

The following month, father was arrested for hitting James, his 62-year-old father. Father's sister, Penny, testified that she and father had a disagreement about keys to a car. Although father did not have a driver's license and had sold the car to Penny's stepson, he was "test driving" it up and down a stretch of road. During the argument, father "pushed at" Penny and, when James came out to intervene, father struck him. Apparently father thought James had pushed him, although James denied that; according to James, father punched him without warning and gave him a bloody nose and a black eye. A deputy who responded regarding the incident testified that James reported at the time that, before hitting him, father had said, "Bring it on, old man[.]" Both Monica and James assert that father had never assaulted James before.

---

[6] In addition to the emotional difficulties that we describe below, A has asthma, and R and P have hemophilia; R, who has the more severe case, requires hospital care when he receives bruises. Both R and J also suffer from attention deficit hyperactivity disorder (ADHD).

The termination trial was held two months after that incident. During the trial, father frequently reacted very inappropriately to testimony, smirking, glaring, and commenting aloud about witnesses. For example, father laughed during McGory's testimony about R's reports of father's violence toward mother.

At trial, father expressed skepticism at the reports that the children feared him, "[b]ecause it's been about five years or so since I've seen them, so why would they be afraid of me?" He conceded that R, the oldest child, would be more likely to be afraid of him because R "was there quite a few occasions where [mother] and I have argued and, you know, fought and stuff, you know. So, I could see that he could possibly be afraid." Father also testified that, during his last supervised visit, J "was beating on a door, screaming that I was beating on him. And that hurt, because I never—I've never beat any of my kids, ever, that I can recollect."

When father was asked about any benefits to the children from continued contact with him, he initially focused on his own desire to "try to grow with them." When asked again how the *children* would benefit if father's parental rights were not terminated, father answered, "To benefit the children? Well, I really don't know how to answer that one." Through counsel, he took the position that, although "it's probably best for [the children] to continue where they are," he now can have a good relationship with them.

With the family's history and father's current condition in mind, we turn to the evidence regarding the children's mental health. Mental health professionals and others who have worked with the children since they were committed to DHS's custody testified that all the children have significant emotional problems arising from father's violent conduct. All of the children have received counseling, although only R was still receiving counseling by the time of trial. We address the testimony of the children's counselors in the order in which they provided services.

Beginning in February 2000, shortly after the children were removed from mother's custody, Sherry, a family and child therapist, worked with R and J. R, in particular,

was exhibiting extremely aggressive and hyperactive behavior at school, which Sherry testified is typical of children who have witnessed domestic violence. R also was diagnosed with post-traumatic stress disorder (PTSD).

Sorenson, a clinical psychologist, evaluated R in July 2003 and, consistently with the earlier assessment, assigned R a primary diagnosis of PTSD and a secondary diagnosis of attention deficit hyperactivity disorder (ADHD) and oppositional defiant disorder. Sorenson explained that PTSD typically occurs when a person witnesses or suffers violence; the trauma causes the person to react strongly to even small events that trigger memories of the traumatic events. The traumatized person feels a sense of danger in situations that others would consider nonthreatening. Sorenson explained that oppositional defiant disorder manifests in defiant reactions to authority figures and includes temper outbursts, frequent arguments, and carrying grudges. When oppositional defiant disorder arises in response to stress or trauma, children

"get very oppositional and reactive when they feel there is a fearful situation happening. And it can bleed over to times when they're not seeming to be under that kind of gun, when there's not a major danger, but because they're so aroused and so upset that they get really anxious and really angry and so they lash out."

Sorenson's evaluation tied R's emotional problems to father's conduct. R's "traumatic memories * * * were all behaviors of his father, specifically harm that he had witnessed coming to his mother and siblings." Sorenson understood that R became much more anxious, angry, and oppositional when he had a visit scheduled with father; after the visits were suspended, those problems decreased substantially. Consistently with Sorensen's opinion, grandmother testified that, when the children visited their father, they would return home "rowdier" and "a lot more nervous." R sometimes would refuse to go to school after visits with father.

Sorenson rejected the theory that R's continuing emotional problems could be attributed to the transition from elementary school to middle school; although Sorenson

thought that the school could have handled R's problems better than it did, R experienced difficulties far greater than the normal transition to middle school. Sorenson also testified that he spoke with R about a number of people—including teachers, grandmother, and mother—and R was able to verbalize a combination of positive and negative emotions. Regarding father, however, R consistently articulated intensely negative feelings, describing father as dangerous and frightening and holding father responsible for the problems he and his family had experienced.

R and grandmother, as R's primary caregiver, received services through Oregon Social Learning Center from May 2003 through June 2004. R initially made good progress, but his behavior deteriorated in the spring of 2004. His case manager attributed that deterioration to two deaths in grandmother's family and to R's fears that he was seeing father in his neighborhood. Randall, the DHS caseworker, testified that R "was afraid to go outside and play because he had seen—thought he had seen his father around their neighborhood. * * * [H]is anxiety levels became extremely high, and he began acting out." Mother confirmed that description, adding that, although R is the most disturbed, all of the children are "scared to death" of father. Grandmother agreed, stating that R was "panic-stricken" by the thought that father was looking for him.

Because of R's increased problems at the end of the 2004 school year, he was referred to SCAR/Jasper Mountain Center, where he could receive an all-inclusive treatment program involving both school and therapy. Jasper Mountain offers programs for children with the most severe disturbances. Garner, R's therapist, saw R individually once a week and saw R with the other children once or twice a month for family therapy. The regularly scheduled therapy ended a few months before trial, but Garner continued to work with R, who was having difficulty with the transition into a new school.

Consistently with prior assessments, Garner testified that R's central psychological diagnosis is PTSD and that he also suffers from ADHD and oppositional defiant disorder. When R encounters a PTSD "trigger"—such as hearing a

door slam or tires squealing—he goes into a traumatic state and becomes hysterical, violent, and out of control for an hour or two. According to Garner, R and J "are more triggered" than the younger children, who were very young when father was living with the family. Garner added that all of the children are afraid of father, but that the youngest two "don't have the specific memories that [R and J] do."

R told Garner that he felt safe at Jasper Mountain because there were enough adults per student there to protect R from father; in public school, R worried that, if he were taken away, no one would notice. Garner also noted that R felt safer when he learned that father had outstanding warrants, because R believed that father would not risk being arrested. Garner testified that R "was very clear about fearing his father" and described specific incidents in which father beat mother and broke into the family's home. Garner believed R's accounts and added that, if R's PTSD had a different cause, that cause would have come out during their sessions together.

Garner testified that, if R knew "that his father was even attempting to keep custody or be any part of his life, that would throw him into a tailspin." Garner also believed that, if R learned that father was attempting to contact the younger children, R would "probably attempt to move the family or just go into a tailspin." Garner explained that R's fears of father's return have continued long after he last saw father and that his fears "come from the PTSD diagnosis which was a result of his father's actions."

Mother and R began reestablishing a relationship not long before Garner started working with R, and that relationship has grown into a healthy one.[7] However, Garner opined that R could not establish the sort of relationship with father that he had established with mother; given that R's "main fear is of his father, I don't think that that relationship could ever be the same as what he's working on with his mother right now. There's just too much damage done in the

_____

[7] Mother relinquished her parental rights but continues to see the children several times per week in supervised visits. Both she and Garner testified that she and the children have a good relationship now.

beginning from the father." Garner also noted that R has never suggested that mother was abusive.

Unger, a counselor with the Center for Family Development, worked with the three younger children from May 2004 to March 2005. Of those three children, J and P had the most problems, with J being rebellious with authority and P being defiant and taking excessive risks. J talked with Unger about not wanting to be like father and about being afraid of father. The two youngest children talked about remembering some scary times, although those conversations were somewhat vague and not extensive. None of the children expressed any desire to have contact with father; both J and A expressed to Unger a desire *not* to have contact with father. By the end of the time that Unger worked with the three younger children, they had met many of the original goals, although a behavioral support specialist continued to work with J through June 2005. Unger believed that contact with father "would destabilize them" and that stability was important for the children.

Despite the children's difficult circumstances, grandmother wishes to adopt them, and that is now DHS's plan for them. Randall testified that the children all expressed a desire to be adopted by grandmother, because "they want to make sure that they stay with [her], that they—and that they're protected from their father." Mother expressed her support for the adoption, explaining that the children want to be with grandmother and are doing well there. Grandmother testified that the children are much calmer now than when they first came to live with her. In addition, R has benefitted from the intensive therapy that he has received and now is doing fairly well with social interactions, although he still struggles to cope with his fears.

Father acknowledges that he cannot provide adequate care for the children. Although, in his response to the termination petition, father requested that the children be returned to him, he did not pursue custody at trial. At the beginning of trial, father's counsel acknowledged that father cannot care for the children:

"THE COURT: * * *

"[Y]ou acknowledge [that father is] not a fit parent. He's not in a position to provide parental care for these children.

"[FATHER'S COUNSEL:]   Right.

"* * * * *

"Physically, he's not going to be able to do the job. Not to say that he's unfit, you know, as a matter of law, but physically he's just not going to be able to do it. He has to have help himself."

Father likewise testified that "I do have a disability because at this point in time in my life, you know, I can't even hardly take care of myself * * * because of my injury that I did to myself."

■ The juvenile court concluded that father is not a fit parent. The court found that father "is not now a resource for the children because of his mental condition." It went on to determine that father was unfit, *inter alia*, because of his failure to present a viable plan for the children's return to his custody. On appeal, father contends that the juvenile court erred by terminating his parental rights. According to father, he was not, "at the time of trial, a threat to children or engaged in conduct that was seriously detrimental to his children." The state contends, *inter alia*, that father is unfit because he is incapable of taking care of the children. Although the juvenile court found multiple reasons for concluding that father is unfit, we decline to address each of them, concluding instead that termination was correct because father's mental condition renders him incapable of providing minimally adequate care to the children and that his condition—which requires leaving the children in foster care—is seriously detrimental to them.[8] We further conclude

---

[8] Father contends that the juvenile court "found father unfit primarily because of his reduced mental abilities which were a result of extensive brain damage from his accident even though the state had not pled unfitness on that basis." The state's petition, however, raised the issue under ORS 419B.504 of father's inability to care for the children, alleging *inter alia* that father was unfit because of his failure to present a viable plan for the children's return to his care and his lack of effort to adjust his circumstances to enable the children's return. Both father and the state introduced evidence regarding father's mental condition, and father openly acknowledged that his condition rendered him incapable of caring for the children.

that termination of father's parental rights is in the children's best interests.

■     We begin our analysis with the law concerning termination of parental rights. ORS 419B.504 provides, in part:

> "The rights of the parent * * * may be terminated as provided in ORS 419B.500 if the court finds that the parent or parents are unfit by reason of conduct or condition seriously detrimental to the child * * * and integration of the child * * * into the home of the parent * * * is improbable within a reasonable time due to conduct or conditions not likely to change. In determining such conduct and conditions, the court shall consider but is not limited to the following:
>
> "(1)    Emotional illness, mental illness or mental deficiency of the parent of such nature and duration as to render the parent incapable of providing proper care for the child * * * for extended periods of time."

The Supreme Court has interpreted ORS 419B.504 to require a two-step analysis. First, the court must determine whether the parent is unfit, *i.e.*, whether the parent has engaged in conduct or is characterized by a condition that is seriously detrimental to the child. Second, if the parent is unfit, the court must determine whether it is improbable that the child will, within a reasonable time, be integrated into the parent's home. *State ex rel Dept. of Human Services v. Smith*, 338 Or 58, 80-81, 106 P3d 627 (2005); *State ex rel SOSCF v. Stillman*, 333 Or 135, 145-46, 36 P3d 490 (2001). As the Supreme Court has emphasized, ORS 419B.504 assumes that a formerly unfit parent can change, and termination is authorized only if the parent is *presently* unfit. *State ex rel Dept. of Human Services v. Rardin*, 340 Or 436, 448, 134 P3d 940 (2006).

Here, father has a mental deficiency, caused by his head injury, and he acknowledges that the deficiency makes him incapable of providing proper care for the children. Of

In any event, father does not contend that the court erred in considering the effects of father's injuries on his fitness—a wise choice in light of father's own argument that his condition is key to the analysis of his current fitness. Father seems to have both acknowledged through counsel that his condition renders him unfit and contended that he is a changed person and *not* unfit because of injuries.

course, a parent need not provide such care without assistance. "[T]here is no statutory requirement that a parent be able to care for the child 'independently.' " *Smith*, 338 Or at 86. Here, however, father does not contend that he can care for the children under any circumstances. Nor does father argue that the children can transition into his care. *Cf. Rardin*, 340 Or at 449 n 10 (noting that the father advocated for the child's careful transition into his home and that the issue was "whether father's parental rights should be terminated, not whether immediate placement in father's home is warranted"). Here, father's condition appears to be permanent, and there is no suggestion that father ever will be able to care for the children.

We next consider whether that condition is seriously detrimental to the children. Father's inability to care for the children requires them to remain in foster care if father's parental rights are not terminated. Continuing in foster care, rather than being adopted, would be seriously detrimental to the children, not only because of the general need for permanency that virtually all children experience, but also because of the trauma they experienced at father's hands before his head injury. The uncontradicted evidence in the record shows that the children have a heightened need for stability and security in their placement and that they expressly wish to be adopted by grandmother, in part because they want assurances that they will live with her permanently and will not be removed by father. They had not seen father for four years before trial, because supervised visits were terminated due to behavior by father that was damaging to the children, including his eventual abandonment of the visits. *Cf. Stillman*, 333 Or at 152 (concluding that the father's condition of being incarcerated was not seriously detrimental to the children where the father and children nevertheless maintained a "loving, strong, and positive" relationship, but noting that, in another case in which the children were not doing well and the father was not able to maintain as strong a relationship, the children might suffer serious detriment).

The legislature has recognized and enacted as policy that children have a right to "[p]ermanency with a safe family[.]" ORS 419B.090(2)(a)(A); *see also* ORS 419B.090(4) (although the legislature favors reunification and has stated

"a strong preference that children live in their own homes with their own families," when that is not possible, "the State of Oregon has the obligation to create or provide an alternative, safe and permanent home for the child"). Here, that need is especially apparent due to the trauma that the children suffered at father's hands, which causes them to particularly fear disruption of their placement and contact with father. Because father's mental deficiency would require the children to remain in foster care indefinitely rather than in a permanent placement, his condition is seriously detrimental to the children.

Father nevertheless contends that his mental condition is not seriously detrimental to the children—precisely *because* he admits that he cannot provide safe care for them. Father contends that, because of his limitations, he simply

> "urged a plan of guardianship with * * * grandmother and monitored contact between him and paternal relatives and children. The fact that father did not present a plan for return of [the] children to his care, but presented a viable plan for continued stability[,] permanent custody and care with * * * grandmother, should not be a basis to find father unfit."

That argument turns the parental fitness analysis on its head. Essentially, father asserts that, if a parent *concedes* that a condition makes him unable to provide minimally adequate care for the children and concedes that the family should *not* be reunified, then the parent cannot be unfit and the children cannot be freed for adoption. Father's argument runs contrary to the children's desire to be adopted and to the statutory scheme, which favors reunification of families, when possible, and permanency for children—not parental visitation while the children remain in foster care.

The exception to the usual permanency preference in the statutory scheme is permanent guardianship, but that exception does not aid father. Although father contends that "[t]he appropriate remedy in this case was permanent guardianship with * * * grandmother," father never filed a petition for permanent guardianship. *See* ORS 419B.365(1) (petition for permanent guardianship may be filed after establishment of jurisdiction but before filing of petition for termination of

parental rights or after dismissal of petition, if rights are not terminated); ORS 419B.366(1) (motion for guardianship must be in writing).

In any event, father's argument for permanent guardianship fails for the same reasons that termination must be granted. The grounds for granting a permanent guardianship are the same as the grounds for termination of parental rights. ORS 419B.365(2). To grant a petition for permanent guardianship, the court must further find by clear and convincing evidence that "[i]t is in the best interest of the ward that the parent never have physical custody of the ward but that other parental rights and duties should not be terminated." ORS 419B.365(3)(b). Thus, after the grounds for termination are proved, a permanent guardianship could be established only if such a guardianship were in the children's best interests. Conversely, of course, parental rights cannot be terminated unless such termination is in the children's best interests. ORS 419B.500. Accordingly, if father had properly brought a petition for permanent guardianship, we would conduct the same analysis required for termination, including the best interests analysis.[9] At the first stage of the analysis, then, we conclude that father is unfit because his mental deficiency makes him incapable of providing proper care for the children and because his condition is a serious detriment to the children because it requires them to remain in foster care when they need permanency.

We next consider whether "integration of the [children] * * * into the home of the parent * * * is improbable within a reasonable time * * *." ORS 419B.504. Urging permanent placement with grandmother, father implicitly acknowledges that integration is not possible, and the record offers no hope that father's condition will improve. We note as well the evidence that the children have special needs, which father not only is incapable of addressing but refuses even to acknowledge, given his persistent denial that he ever subjected them to domestic violence or gave them reason to fear him.

---

[9] As addressed further below, we conclude that termination is in the children's best interests, foreclosing the option of a permanent guardianship.

■ When, as here, the parent is unfit and integration into the parental home is improbable within a reasonable time, then the court must consider the best interests of the children in determining whether to terminate parental rights. ORS 419B.500; *see also Smith*, 338 Or at 79 (noting that, even if termination is in the child's best interests, it can be ordered only when clear and convincing evidence establishes the statutory grounds for termination of parental rights).

In terminating father's parental rights, the juvenile court concluded that, even after his injury, father engaged in violence against his own father and that the children likely would be exposed to further domestic violence if father had them in his care. The court also found the evidence very credible and clear that the children have suffered severe emotional harm and are terrified of father. Accordingly, the court concluded that "further contact could not advance the development of any of these children." We have no hesitation in agreeing with the juvenile court that termination of father's parental rights is in the children's best interests.

Father's testimony at trial suggests that he has given little, if any, thought to the children's interests. His only argument is that children benefit from knowing their parents and the children might benefit from seeing that father is no longer violent. We find that father's assertions of nonviolence are not believable, given his violence toward his own father shortly before the termination trial, his denial of the children's accounts of his prior violence, and his cavalier attitude toward reports of their continuing fear of him. Moreover, father's assessment of the benefits of resuming contact with him is unsupported by any evidence. Father has shown no willingness to address the children's continuing fears and, indeed, does not believe that his conduct has traumatized the children. Although he claims that he is no threat to the children today, he ignores the extensive evidence that they are terrified of him and destabilized by the very thought of contact with him.

The record clearly establishes that all of the children will suffer emotional harm from contact with father. They are too traumatized to form healthy relationships with him now.

The only evidence in the record, and the consistent viewpoint of experts who have worked with the children over the years, is that contact with father would be destabilizing.[10] Those assessments are supported by the children's reaction to the mere thought of contact with father. The children are scarred by their memories of father, and they have expressed the desire to avoid contact with him. Accordingly, we conclude that termination of father's parental rights is in their best interests.

Affirmed.

---

[10] We reject father's view that the fact that the mental health professionals who have worked with the children had never met him somehow undercuts their assessment that contact with him would be damaging to the children. We are satisfied that the children's fears and emotional problems arose from father's conduct during the time that the children were in contact with him. A professional assessment of father's current tendencies toward violence is not necessary to understand the *children's* current emotional health and needs.