Argued and submitted January 9, decision of Court of Appeals affirmed and judgment of circuit court reversed December 20, 2001

In the Matter of
Jacara Murelle Ahlgren-Stillman,
a Minor Child.

STATE ex rel STATE OFFICE FOR
SERVICES TO CHILDREN AND FAMILIES,
*Petitioner on Review,*

*and*

Laura AHLGREN,
*Respondent,*

*v.*

Donald E. STILLMAN,
aka Donnie Stillman,
*Respondent on Review.*

In the Matter of
Keith Alexander Stillman,
a Minor Child.

STATE ex rel STATE OFFICE FOR
SERVICES TO CHILDREN AND FAMILIES,
*Petitioner on Review,*

*and*

Laura AHLGREN,
*Respondent,*

*v.*

Donald E. STILLMAN,
aka Donnie Stillman,
*Respondent on Review.*

(CC 96-276J, 96-275J; CA A107034; SC S47733)

36 P3d 490

Denise G. Fjordbeck, Assistant Attorney General, Salem, argued the cause and filed the brief for petitioner on review. With her on the brief were Hardy Myers, Attorney General, and Michael D. Reynolds, Solicitor General.

James A. Palmer, Eugene, argued the cause and filed the brief for respondent on review.

Lynn M. Travis and Mary Kane, of the Juvenile Rights Project, Inc., Portland, filed a response for minor children.

Before Carson, Chief Justice, and Gillette, Durham, Leeson, Riggs, and De Muniz, Justices.**

GILLETTE, J.

** Kulongoski, J., resigned June 14, 2001, and did not participate in the decision of this case; Balmer, J., did not participate in the consideration or decision of this case.

**GILLETTE, J.**

In this termination of parental rights case, the trial court terminated father's parental rights in his two minor children, because of his incarceration and drug-related activities. *See* ORS 419B.504 (1997) (providing for termination of parental rights if court finds, *inter alia*, parent unfit by reason of conduct or condition seriously detrimental to child). The Court of Appeals reversed, holding that the evidence did not demonstrate that father was unfit at the time of the termination hearing. *State ex rel SOSCF v. Stillman*, 167 Or App 446, 1 P3d 500 (2000). For the reasons that follow, we affirm the decision of the Court of Appeals.

In reviewing a decision of the Court of Appeals that is essentially an appeal from a suit in equity, ORS 419A.200(5); ORS 19.415(3), this court may review *de novo* or may limit its review to questions of law. ORS 19.415(4); *see also Ken Leahy Construction, Inc. v. Cascade General, Inc.*, 329 Or 566, 571, 994 P2d 112 (1999) (so stating). In this instance, because we reach issues that the majority opinion of the Court of Appeals did not address, and some of those issues are fact-dependent, we elect to review the record *de novo*.

Before his most recent conviction and incarceration, father abused methamphetamines and, before father met mother, he had been convicted twice on drug charges. In fact, father met mother when both were in a drug treatment program. They eventually had a daughter (born in 1991) and a son (born in 1993). After father's third arrest in 1996 on a federal charge of possession with intent to manufacture methamphetamine, and in light of mother's persistent drinking and methamphetamine use, the State Office of Services to Children and Families (SOSCF)[1] sought to terminate their parental rights. SOSCF postponed action on that petition, notwithstanding father's impending criminal trial and likely incarceration, and ultimately withdrew the petition in January 1998, after father entered prison, because mother appeared to be doing well in her efforts to overcome her own

---

[1] The 2001 Legislature abolished SOSCF and transferred all its functions to the Department of Human Services. Or Laws 2001, ch 900, §§ 1, 5. That action has no effect on this proceeding.

drug problem. However, mother again relapsed and, in August 1998, SOSCF filed another petition to terminate both mother's and father's parental rights. At the subsequent termination hearing in June 1999, mother conditionally stipulated to terminating her rights; father did not.[2]

When father was arrested, SOSCF initially placed the children for a short period in temporary care. Soon afterwards, however, SOSCF placed the children with a foster parent in the extended family, namely, mother's former stepmother. At the time of the termination hearing, that foster parent could retain the children only for a few more months. Thus, at least one transition was in the offing for the children, although that transition likely would to be to another member of the highly supportive extended family.

At the termination hearing, SOSCF's case centered on the children's need for permanence. A social worker who provided counseling to the children testified on behalf of SOSCF that the children needed permanency, predictability, and stability in their lives, and that changes, such as those that might follow from the pending termination proceeding, created tension for them. For example, she testified that the older child exhibited "parentified" behavior in the months preceding the termination hearing, in that the child assumed an adult role in the foster home in trying to take control of her situation. The child also had gained a significant amount of weight during that period. According to the social worker, that weight gain indicated "a great deal of anxiety in her life and that she was probably overeating to try to reduce that." Further, the social worker testified:

> "[T]hese children are very similar to other children I work with that have been in long-term foster care. They need permanency, they need safety, they need to know where they're going to be next week, next month, next year, and where they go to high school and where they're going to be coming home from vacations.

---

[2] Mother stipulated that, if father's parental rights were terminated, then her rights would be terminated as well. Father's testimony—which we accept—was that he intended to divorce mother, because mother either was unable or unwilling to abandon her lifestyle of drug abuse. Thus, although this opinion concludes that father's parental rights will not be terminated, it should not be read as a basis for a similar disposition—or any disposition—of mother's case.

"* * * * *

"Their life goes on hold, it continues to be on hold developmentally. It's very difficult for a child to continue to make progress in their life, go through the developmental stages that they need to go through to become adults if even their present is tentative, that they don't know what's going to be predictable for them.

"* * * Sometimes I've referred to children like this as the ghost children because they seem insubstantial in their connection with the world and with reality and with present time because they're so insecure about what's going to happen for them."

Other than that general testimony, which principally concerned the effect of foster care on the children, there is very little psychological evidence in the record pertaining to the children. The record contains no written mental health evaluation of either child. Indeed, the only testimony concerning the psychological condition of the younger child was that he was relatively quiet and reserved, and that he worried about his parents. Moreover, there is virtually nothing in the record that sheds light on any ill effects that the children might have suffered from their parents' involvement with drugs before the children were placed in foster care.[3]

SOSCF also focused on the possibility that father would be unable to overcome his addiction to drugs and the likelihood of a relapse. The agency introduced a psychological evaluation of father, which was performed over two years before the termination hearing, and several months before father's conviction and sentencing. The psychologist who examined father concluded that father at that time was likely

---

[3] In that regard, there is evidence in the record to the effect that, after the arrest, the older child told the foster mother that she remembered having seen a green liquid being stirred in the family home. The trial court found, on that basis, that "[f]ather was engaged in full-scale drug manufacturing and the children knew it." Our own review of the record does not support that finding with respect to the children, for two reasons. First, the reference to a "green liquid," without more, is not a sufficient basis for concluding that either child had seen drugs. Indeed, the foster mother's testimony indicated that even she was not certain that that was a reference to drugs. Second, the older child was no more than four years old at the time and, thus, even if the green liquid had been drugs, it is not reasonable to infer that the child knew that her father was involved in criminal activity. What the record does support—and we so find—is that father's drug manufacturing activity for a time placed the children in serious physical danger.

to relapse because he was externally motivated, *i.e.*, he was motivated to cooperate with counseling and treatment not through a sincere desire to improve himself, but merely out of a desire to avoid the consequences of noncompliance.

The psychological report concluded, however, that "[c]hemical dependency is the primary psychological problem that would impair [father's] ability to function as a parent." At the termination hearing, the psychologist elaborated, testifying that, other than chemical dependency, father had no serious mental health problems: "He has * * * the ability to [be a good parent] and lacks any serious psychological problems that would * * * make that impossible or prevent him from doing that if that is what he tried to do." SOSCF presented no more recent evidence of father's mental health status.

Father, on the other hand, submitted evidence that he had made progress in rehabilitation during his incarceration. Father completed a multi-phase drug treatment program that began before father's trial on the drug charges. The clinical supervisor in charge of that program testified that, when father entered the program, he was angry and resistant, he minimized the significance of his addiction, and he was motivated to complete the program out of a desire to obtain a lighter sentence at his trial. However, after several weeks, the counselor observed that father had made a significant turnaround in his attitude. At the completion of the first phase of his treatment, father asked for an additional four weeks of treatment. He was highly successful in that program. The clinical supervisor also testified that father sincerely came to appreciate the effect that his drug use had had on his children and was addressing the deficits in his life so that he could maintain custody of the children.

In addition, father's therapist for the second phase of the drug treatment program stated that, notwithstanding a brief relapse before beginning that phase, father was the most successful client with whom she had ever worked.[4]

---

[4] In fact, father had contacted the therapist and requested individual counseling to address the relapse. The second phase of the drug treatment program ended in September 1997. Father was convicted and sentenced in June 1997 and entered prison in November 1997. As of the time of the termination hearing, father had been clean and sober for 26 months.

Father also took parenting classes, including an extensive, 72-hour parenting class accredited through Chemeketa Community College. He completed a 12-week human sexuality class and a 62-hour real estate class. Father organized a prison 12-step program and worked for the forest service. In all those endeavors, father drew uniformly high praise from the officials in charge.[5]

At the time of the termination hearing, father's remaining prison time was approximately four months. After that, father predicted that he would reside in a halfway house or possibly in home confinement. Father admitted that the children might have to remain in foster care for as long as a year, until he was able to find a job and provide a home for them. An SOSCF representative testified that, given the amount of time that the children already had spent in foster care, that period was simply too long. She stated that SOSCF "is not willing to consider [father] and is not able to consider him as a resource for his children because he is incarcerated. What the children need is permanency." The representative also testified that it was "in the best interests of these children not to continue to wait any longer as they've already waited for three years." She added that

---

The psychologist who testified on behalf of SOSCF expressed his opinion at the termination hearing that the fact that father was able to maintain his sobriety in prison was not a valid indicator of whether father would be able to do the same outside of the controlled prison setting. The psychologist conceded, however, that he had not seen father in over two years and that additional information on father's behavior while in prison, such as his voluntarily quitting smoking, organizing a 12-step program for the prison, and working cooperatively with SOSCF, might alter the psychologist's opinion of father's chances for success.

[5] For example, the instructor of the prison parenting class stated that father's "positive outlook and enthusiasm served as a model for other students." The instructor of the human sexuality class stated that father had shown himself to be "a man of high principles and consistent sincerity." He concluded that father was sincerely motivated by a desire to enhance his parenting skills and found him to be "an engaging and motivated student." The instructor of the real estate class stated that father

"has shown extreme discipline and desire to learn. At his request I have provided him personal attention because of his exhibited desire and obvious ability to comprehend the subject matter. I * * * have offered this acknowledgment because [father] is one of the few that deserves recognition for his devotion to his family and his future in Society."

The forestry crew supervisor stated that father "demonstrated outstanding work ethics in whatever he does."

"the concern is his current incarceration, the length of time it would take him to transition back into the community to demonstrate that he is in fact clean and sober. And that will take a long period of time in order for him to demonstrate that. Based on that, the agency does not feel it's in the children's best interest to have them remain in foster care indefinitely while the father demonstrates that to the agency and to the community."

The trial court found by clear and convincing evidence that father was unfit. *See* ORS 419B.521(1) (setting clear and convincing evidence standard). It based that finding on what that court styled as father's "criminal conduct which impairs his ability to adequately care for [the children], that's by virtue of his incarceration." It also found that the children needed permanency immediately. It found that father's desire to make the children wait until he had established himself was an example of father putting his needs ahead of the children's. The court also thought that father's continued incarceration and the likelihood that father would relapse into addiction upon release from prison "pose[d] an unacceptable risk to the mental and emotional well being of the children." The trial court therefore terminated father's parental rights and committed the children to the care of SOSCF.

On father's appeal, the Court of Appeals reversed. The court reviewed the evidence regarding father's incarceration and noted that, in light of the short duration of the balance of his sentence and potential time to be spent in a halfway house, "such a relatively short period of separation" does not render a parent unfit. *Stillman*, 167 Or App at 457. In addition, the court held that SOSCF had not proved that father's prior drug use had made him unfit as a parent. "[T]he point is not that we are certain that father will succeed. Rather, the record does not show, by clear and convincing evidence, that he will not." *Id.* at 459. The court concluded:

"On this record, neither father's incarceration nor the possibility of a relapse provides clear and convincing evidence that father is presently unfit under ORS 419B.504 (1997). Accordingly, we need not decide whether the conduct or condition that makes father unfit also makes integration of his children into his home improbable within a reasonable time."

*Id.* (citations omitted). Chief Judge Deits dissented, maintaining that father was unfit and that the children's integration into the father's home was improbable within a reasonable time. *Id.* at 459-67 (Deits, C. J., dissenting). We granted SOSCF's petition for review.

Generally, a court may terminate parental rights for the purpose of freeing a child for adoption if the court finds that termination is in the best interest of the child. ORS 419B.500. The specific bases for termination are set out in ORS 419B.502 to ORS 419B.508. Those statutes provide for termination based on such circumstances as extreme parental misconduct, unfitness, neglect, or abandonment. The statute that sets out the formula for a termination upon a finding of parental unfitness, ORS 419B.504, provides:

> "The rights of the parent or parents may be terminated as provided in ORS 419B.500 if the court finds that the parent or parents are unfit by reason of conduct or condition seriously detrimental to the child and integration of the child into the home of the parent or parents is improbable *within a reasonable time* due to conduct or conditions not likely to change. In determining such conduct and conditions, the court shall consider but is not limited to the following:
>
> "(1) Emotional illness, mental illness or mental deficiency of the parent of such nature and duration as to render the parent incapable of providing proper care for the child for extended periods of time.
>
> "(2) Conduct toward any child of an abusive, cruel or sexual nature.
>
> "(3) Addictive or habitual use of intoxicating liquors or controlled substances to the extent that parental ability has been substantially impaired.
>
> "(4) Physical neglect of the child.
>
> "(5) Lack of effort of the parent to adjust the circumstances of the parent, conduct, or conditions to make the return of the child possible or failure of the parent to effect a lasting adjustment after reasonable efforts by available social agencies for such extended duration of time that it appears reasonable that no lasting adjustment can be effected.

"(6) *Criminal conduct that impairs the parent's ability to provide adequate care for the child.*"

(Emphasis added.) The emphasized parts of the statute were added in 1997. Or Laws 1997, ch 873, § 7.

Until 1997, ORS 419B.504 had provided that "integration of the child into the home of the parent or parents is improbable *in the foreseeable future* due to conduct or conditions not likely to change." ORS 419B.504 (1995) (emphasis added); *see* Or Laws 1997, ch 873, § 7 (indicating changes to statute). The effect of the amendment was to substitute the phrase "reasonable time" for the phrase "foreseeable future." The former version of the statute did not define "foreseeable future." By contrast, a "reasonable time" now *is* defined. It "means a period of time that is reasonable given a child's emotional and developmental needs and ability to form and maintain lasting attachments." ORS 419A.004(21).

 The legislative intent respecting the statute is crucial to this case. To determine that intent, we look first to the text and context of the statute. *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610-11, 859 P2d 1143 (1993). The text of the statute is the best evidence of legislative intent. *Id.* at 610. If that intent is clear from the text, read in context, further analysis is unnecessary. *Id.*

ORS 419B.504 sets out a two-part test for determining whether to terminate parental rights, both parts of which must be met before the court orders termination. First, the court must address a parent's fitness: The court must find that the parent is "unfit by reason of conduct or condition seriously detrimental to the child." That, in turn, requires a two-part inquiry: The court must find that: (1) the parent has engaged in some conduct or is characterized by some condition; and (2) the conduct or condition is "seriously detrimental" to the child. Second—and only if the parent has met the foregoing criteria—the court also must find that the "integration of the child into the home of the parent or parents is improbable within a reasonable time due to conduct or conditions not likely to change." That second part of the test for termination requires the court to evaluate the relative probability that, given particular parental conduct or conditions,

the child will become integrated into the parental home "within a reasonable time."

■ The use of that phrase, "within a reasonable time," reflects a legislative concern that SOSCF and the courts achieve a permanent home for a child more promptly than the phrase that formerly was in the statute, "the foreseeable future," suggested. In amending the statute, the legislature did not provide for a specific time period for integration, but provided instead for such a period of time as "is reasonable given a child's emotional and developmental needs and ability to form and maintain lasting attachments." ORS 419A.004(21). That inquiry is child-specific. It calls for testimony in psychological and developmental terms regarding the particular child's requirements.

■ ORS 419B.090 demonstrates the broader context of the two inquiries under ORS 419B.504. That statute declares that it is the "policy of the State of Oregon to recognize that children are individuals who have legal rights." ORS 419B.090(2)(a). Those rights include the right to "[p]ermanency with a safe family." ORS 419B.090(2)(a)(A). The legislature added that statement of policy in 1997, during the same session in which it revised ORS 419B.504. *See* Or Laws 1997, ch 873, § 2a (adding statement). Consistent with the foregoing legislative policy, the focus of both parts of the test for termination under ORS 419B.504 is on the detrimental effect of the parent's conduct or condition on the child, not just the seriousness of the parent's conduct or condition in the abstract. Thus, the court first must identify the parent's conduct or condition, and then measure the degree to which that conduct or condition has had a seriously detrimental effect on the child.

In ORS 419B.504, the legislature has provided a nonexclusive list of six examples of conduct and conditions that courts must consider, both in determining whether a parent is unfit and in determining whether the parent's disqualifying circumstances are not likely to change. But those statutory examples are just that—examples. The focus of that part of the statute is on the parent's conduct or condition.

A significant part of the discussion and briefing in this case has centered on the directive to the court to consider "criminal conduct that impairs the parent's ability to provide adequate care for the child." ORS 419B.504(6). As noted, the trial court relied on that factor in concluding that father is unfit and it was one of the bases for SOSCF's petition to terminate father's parental rights.

The wording of ORS 419B.504(6) is broad. It authorizes the court to consider any "[c]riminal conduct" that "impairs the parent's ability to provide adequate care for the child." "Criminal conduct" refers to an act—under this statute, a criminal act of the parent; it is not a reference to a "condition" that affects the parent. Moreover, the criminal conduct must "impair" the parent's ability to provide adequate care for the child. Criminal conduct that meets those statutory requirements could include such conduct as abetting the child's own criminal conduct, stealing the child's property, or soliciting the child to commit a crime. The question is, however: Do the *sequellae* of a parent's criminal acts, such as flight, concealment, or incarceration, also qualify as "criminal conduct" under ORS 419B.504(6)?

■　　That depends. The plain words of the statute require the *conduct* to be "criminal." Flight and concealment—to use but two examples—themselves may be criminal acts and, hence, "criminal" conduct. Incarceration, on the other hand, is a possible consequence of criminal conduct, but it is not, itself, such conduct. Thus, it would be error for a court to rely on an incarceration as "criminal conduct" and to base a decision to terminate parental rights specifically on the basis of ORS 419B.504(6).[6]

■　　However, the foregoing discussion does not place incarceration, and its consequences for the children, outside the purview of the court. A parent's imprisonment for a criminal act is, in any event, a "condition" of the kind that the

---

[6] In the present case, as noted, the trial court did rely on father's incarceration to establish the "criminal conduct" factor. However, father did not make an objection on that basis and, therefore, the error was not preserved. In any event, however, we do not believe that the mislabeling of incarceration as "criminal conduct" rather than as a "condition" made a difference. All the parties were aware, at all pertinent times, that it was the fact of the incarceration and its effect on the children that were at issue in the case.

court is entitled to consider under the wording of the first part of ORS 419B.504. It cannot be disputed reasonably that any prolonged incarceration could be a condition so "seriously detrimental to the child" as to warrant a finding of unfitness.[7] With that in mind, we return to the analysis that the Court of Appeals majority followed in this case.

The Court of Appeals began its analysis of father's fitness by considering his conduct or condition. In so doing, the court focused principally on father's history of substance abuse and the possibility that he would relapse. The court concluded that the record did not establish, by clear and convincing evidence, that that conduct or condition rendered father presently unfit under ORS 419B.504, given father's activities while in prison in attempting to overcome his addiction and to become a more responsible parent. *Stillman*, 167 Or App at 459.

██ ██ We agree with the Court of Appeals that, given father's sincere and substantial efforts to address his drug problem while in prison, father's *history* of drug abuse was not "conduct or condition" that rendered him unfit *at the time of the termination hearing*. In reaching that conclusion, we do not mean to minimize the significant risks to which father subjected the children by operating a drug manufacturing laboratory in the family home, both in terms of the danger from the laboratory itself and of the risks associated with having dangerous individuals in the home. Indeed, it even might be true that, as the Court of Appeals suggested, an attempt by SOSCF to terminate father's parental rights at around the time of his arrest might have led to a different outcome. But all that has occurred since that time indicates

---

[7] In *State v. Grady*, 231 Or 65, 371 P2d 68 (1962), this court declined to terminate the parental rights of a young mother simply because she was incarcerated. Subsequently, that case was cited for the proposition that "imprisonment was not held conduct 'seriously detrimental to the child.'" *State v. McMaster*, 259 Or 291, 299, 486 P2d 567 (1971). Whether or not that statement in *McMaster* was a fair characterization of the holding in *Grady*, it is not a fair characterization of the determination that a trial court is authorized to make. The court may inquire into the extent to which a parent's imprisonment is detrimental to the child. If the court finds that the incarceration is seriously detrimental to the child, then the first part of ORS 419B.504 permits—but does not require—the court to find that the parent is unfit by reason of that condition.

that father's irresponsible behavior will not be repeated. The statute requires us to evaluate whether father *presently*, *i.e.*, at the time of the termination hearing, was unfit. On this record, the state has not shown that he was.

The Court of Appeals considered only briefly the fact of father's incarceration. It noted that, at the time of trial, father had four months left on his federal sentence and then would have to spend several more months in a halfway house establishing his ability to care for the children. The court concluded that, in light of that relatively short period of separation remaining before the family could be reunited, father's incarceration also did not render him unfit.[8] That line of analysis, however, improperly conflated the requirements of the two parts of the test for determining whether termination of parental rights is appropriate. It is only under the second, "integration" part of the test under ORS 419B.504 that the court considers whether there is a probability of integration of the child into the parent's home "within a reasonable time." As we have explained, the "fitness" inquiry comes first, and the period of time that father's inability personally to care for the children would continue adds nothing to the court's initial determination respecting father's fitness.

As we have said, father's incarceration is a condition of the kind that we may consider under ORS 419B.504 and, if it were seriously detrimental to the children, would be sufficient to warrant a finding of *unfitness*, notwithstanding the relatively short period that it was likely to continue. Clearly, father's unfinished incarceration and the period of time that he would be required to spend in a halfway house precluded him personally from providing adequate care for the children or otherwise maintaining a normal parental role as the children's father.

Having concluded that father's "conduct or condition" satisfies one of the statutory criteria for a finding of unfitness, we turn to the second part of that fitness inquiry, *viz.*,

---

[8] In that connection, we observe that the Court of Appeals did not cite ORS 419B.504(6) or otherwise acknowledge in its analysis of the weight to be given father's incarceration that the trial court based its finding of unfitness on its conclusion that father's incarceration established that statutory factor.

whether that conduct or condition is "seriously detrimental" to the children.[9] On that subject, the trial court found that the children suffered serious anxiety about their future. Our own *de novo* review of the record shows that evidence concerning the "detriment" that the children have suffered was related to and stemmed principally from the children's worry about their parents' well-being and the uncertainty surrounding the termination proceeding itself.[10]

Generally, the record demonstrates that the children are relatively happy and well-adjusted. The foster mother testified at length that the children have friends, play sports, are actively involved in other extra-curricular activities, and do well in school. Indeed, virtually all the evidence of detriment in the record concerned the older child (her "parentified" behavior, her recent problems in school, and her weight gain) and appeared to have been tied either to SOSCF's curtailing of telephone conversations between father and the children or to the pending termination proceeding itself. Testimony concerning the younger child was simply that he was quiet and worried about his parents. The children's therapist summarized the effect on the children as follows: "They need permanency, they need safety, they need to know where they are going to be next week, next month, next year, and where * * * they're going to be coming home from vacations."

The question before this court, then, is whether the children's anxiety about their future, caused by father's incarceration, is the sort of serious detriment contemplated in the parental rights termination statute.

This court has considered the phrase "seriously detrimental" in ORS 419B.504 on only one previous occasion, in *State v. McMaster*, 259 Or 291, 486 P2d 567 (1971). In that

---

[9] Because the Court of Appeals concluded that neither father's incarceration nor his substance abuse made him unfit, that court did not need to, and did not, address the detrimental effect of father's conduct on the children. Neither did it need to address whether integration of the children into father's home was improbable within a reasonable time.

[10] In that regard, we note that, other than the hearing testimony of the children's therapist, the record contains no psychological reports or evaluations of the children's mental or emotional health; neither does it contain *any* evidence shedding light on the effects of father's conduct or condition *as a parent* on the children.

case, the child initially was removed from the parents' home as a baby and placed in foster care because of the parents' neglect. The child subsequently was not returned to the parents; the state moved to terminate parental rights, based on the parents' inability to stabilize themselves financially or to find and maintain adequate housing. With regard to the detriment to the child, this court stated the following:

"There was testimony which was uncontradicted that if the child were now taken from the foster parents and placed with her natural parents it would have a seriously detrimental effect upon the child. This same testimony developed, however, that this is primarily because the child has lived with foster parents for almost all of her now almost six years. *The detrimental effect is not necessarily because of the conduct of her natural parents, except that the child may resent being taken from the better all-around environment provided by her foster parents as compared to that which would be provided by her natural parents.*

"* * * * *

"We are of the opinion that the state of the McMaster family is duplicated in hundreds of thousands of American families, transiency and incapacity, poverty and instability. The witness was undoubtedly correct when he stated that living in the McMasters' household would not 'allow this child to maximize her potential.' However, we do not believe the legislature contemplated that parental rights could be terminated because the natural parents are unable to furnish surroundings that which would enable the child to grow up as we would desire all children to do. *When the legislature used the phrase, 'seriously detrimental to the child,' we believe that they had in mind a more serious and uncommon detriment than that caused by the conduct of parents such as the McMasters.*"

*Id.* at 302-03 (emphasis added).

We recognize that father's "conduct or condition" is substantially different from that of the McMasters. We also recognize that the legislature amended ORS 419B.504 after this court's decision in *McMaster* to include conduct similar to the McMasters' as grounds for termination. *See* Or Laws 1993, ch 33, § 140 (adding, among other things, rule that parent's lack of effort to adjust circumstances to make return of

child possible itself may be ground for termination). Nonetheless, the evidence concerning the resulting detriment to the children, *viz.*, anxiety relating to an impending transition, was similar. It does not strike us as extraordinary that children involved in a termination proceeding would experience anxiety about their future. However, as in *McMaster*, we do not think that the level of anxiety that the children have experienced here is the sort of serious detriment that the legislature contemplated as providing the basis for a conclusion that a parent is unfit.

This court has stated that "[t]he reason for terminating parental rights ought to be related to the parent's conduct as a parent." *Simons et ux v. Smith*, 229 Or 277, 280, 366 P2d 875 (1961). In this case, nothing in the record suggests that father's personal relationship with his children was anything but loving, strong, and positive.[11] The evidence was uncontroverted that the children have enjoyed their visits with father and are attached to him, and that father consistently has written and telephoned the children throughout his incarceration.

We are aware that the fact that the children are doing as well as they are, and even the fact that father has been able to maintain the relationship with the children that he has, is due largely to the fortuitous circumstance of a strong extended family structure, which includes relatives who are willing to serve as foster parents. In another case, given similar conduct or condition on the part of the parent, but absent the strong family support that has been and is present here, the children might suffer such serious detriment as to satisfy the requirements of ORS 419B.504. However, on this record, SOSCF has failed to show by clear and

---

[11] In that connection, we note that the trial court stated that father's view that the children would not be harmed seriously by waiting a few more months for him to become available to parent them is "an example of father's continued inability to put the children's needs ahead of his own." With that comment, the trial court effectively told father that, by asserting his desire to continue to parent the children, he placed his own needs ahead of the children's; concomitantly, the way to demonstrate his commitment to parenting the children was to cease his efforts to do so. That clearly placed father in an untenable position. This court took the opposite view of similar behavior in *State v. Grady*, 231 Or at 68, commenting that "[w]e deem it of no little significance and a display of the depth of [mother's] maternal regard that, notwithstanding her penal situation, she elected to contest the effort to take the child away from her forever, and failing in the trial court, initiated this appeal."

convincing evidence that father's conduct or condition was seriously detrimental to his children so as to warrant a finding of unfitness. The Court of Appeals' similar conclusion was correct.

Based on the foregoing, we conclude that the trial court erred in terminating father's parental rights. The decision of the Court of Appeals reversing the trial court was correct.

The decision of the Court of Appeals is affirmed. The judgment of the circuit court is reversed.