Argued and submitted July 17, reversed and remanded November 18, 2009

In the Matter of R. A. B.-O.,
aka R. B.,
aka R. B.-O.,
a Minor Child.

STATE ex rel DEPARTMENT OF HUMAN SERIVCES,
*Respondent,*

*v.*

L. S.,
*Appellant.*

Washington County Circuit Court
J030663;
Petition Number M3J030663;
A141440

220 P3d 457

James J. Spindor argued the cause and filed the brief for appellant.

Amanda J. Austin, Assistant Attorney General, argued the cause for respondent. With her on the brief were John R. Kroger, Attorney General, and Jerome Lidz, Solicitor General.

Before Edmonds, Presiding Judge, and Wollheim, Judge, and Sercombe, Judge.

EDMONDS, P. J.

## EDMONDS, P. J.

Mother appeals a juvenile court judgment terminating her parental rights to her eight-year-old son, R, and permanently committing R to the Department of Human Services (DHS) pursuant to ORS 419B.504. On appeal, mother contends that there is not clear and convincing evidence that she is unfit to act as a parent for R, arguing that her health has improved significantly from the time R was placed in foster care and that she has support from family and friends to assist her in parenting R. On *de novo* review, ORS 19.415(3), we reverse.

Mother has nine children including R, her youngest, who was eight years old at the time of trial. Seven of mother's children are adults. At the time of trial, mother's 16-year-old son, JO, was not in her custody but was scheduled to return to her custody within two months. Mother is 43 years old and suffers from significant health problems. In 2003, she had a cardiac incident that resulted in her brain being deprived of oxygen for a period of time. Mother was hospitalized for several weeks due to the incident. When she was released, she was unable to care for the minor children in her custody, including R. She suffered from decreased mental functioning and severe physical health problems as well. She had difficulty remembering things, had slow and slurred speech, and had a hard time carrying on conversations. She also was required to be on medication that caused her to be continuously fatigued.

Mother has a history with DHS going back to 1995, including eight founded referrals since that time for neglect, unsanitary living conditions, and abuse. She has participated in many DHS programs and services in the past with varying degrees of success. Although mother was dropped from some programs for missing meetings, the evidence demonstrates that mother has learned to keep a neat and clean home and has learned nonabusive techniques for discipline.

After progressing in her recovery from the 2003 incident, mother presented a viable plan to DHS in 2005 for taking care of the children, including having family and friends and her older daughters help her to care for R. At that time,

the minor children were returned to mother, and the wardship was dismissed.

In 2006, mother called the police when she could not find R, who was six years old at the time. She thought he had been at a friend's house, but she did not know the address or the name of the friend. The police found R walking along a busy street. Mother was convicted of criminal neglect because of this incident and placed on probation. Due to the above circumstances, R was again placed in foster care and has been in foster care since that time. In other words, mother has never had the opportunity to have R live full time in her residence under DHS's supervision since 2006, despite evidence of improvements in her mental and physical health.

From summer 2007 to fall 2008, R had weekly unsupervised visits with mother in her home that lasted seven to eight hours. In a November 2007 letter from DHS to mother, DHS stated, "These visits are consistent and [mother] has demonstrated some strong parenting skills during these visits." The visits often included mother taking R to church and a tutor coming to mother's home to help R with reading. On the other hand, a DHS caseworker reported that mother once allowed R to ride in a car with an unapproved driver and then lied about it to the caseworker. R later told his foster mother that he was not wearing a seatbelt at the time. After that incident, the DHS caseworker talked with mother about not allowing R to ride with unapproved drivers and gave her guidelines in writing for the first time regarding R's transportation. The visits were changed to three-hour supervised visits twice per month when R moved in with his foster/adoptive parents. Apparently, the change in visitation was to facilitate R bonding with his prospective adoptive parents and not because of any abuse or neglect by mother during the previous unsupervised visits.

In June 2008, DHS filed a petition to terminate mother's parental rights as to R. The matter went to trial in January 2009. The trial court found that it was uncontested that mother was unable to be a fit parent without assistance from others. According to the court, "[t]he real issue was whether the mother was able to provide a plan that would make up for her deficiencies." The trial court also found that

"4.    Since the time the child came into DHS care in 2006, the mother has improved. The mother is able to clean house, pay her bills, satisfy probation requirements, and move about without an oxygen tank. The mother has more energy and is not sleeping as much as she had in the past. She is more robust and has more color. In terms of general health, overall, the mother is doing better.

"5.    The mother presented evidence of a broad community of supporters that were willing to provide help to her. Additionally, the central piece of this trial, the mother presented evidence that her daughter [JE] was willing to move into the home to help her care for the child on a day to day basis.

"* * * * *

"7.    [JO], the mother's 16 year old son, is currently in the custody of the State, but is coming to live with the mother. The exhibits demonstrate that he is a challenging child with high needs. He will need supervision and guidance to keep him out of trouble.

"* * * * *

"13.    DHS proved by clear and convincing evidence that the mother's improved health combined with the plan to parent the child with support from the community and [JE] is not enough to meet the child's needs.

"14.    Returning the child home to his mother with her plan in place would be seriously detrimental to him and future neglect would likely occur.

"15.    The mother is unfit by reason of conduct or condition seriously detrimental to the child and integration of the child into the mother's home is improbable within a reasonable time due to conduct or conditions not likely to change, including the following:

"a)    Failure to present a viable plan for the return of the child to the parent's care and custody.

"b)    An emotional illness, mental illness, or mental deficiency of such nature and duration as to render the parent incapable of providing care for extended periods of time.

"c)    Physical and emotional neglect of the child.

"d) Failure to effect a lasting adjustment after reasonable efforts by available social agencies for such extended duration of time that it appears reasonable that no lasting adjustment can be effected.

"16. It is in the child's best interests that the mother's parental rights be terminated and that the child be freed for adoption."

On *de novo* review of the record, we make the following findings. As the trial court acknowledged, mother's health has improved significantly since November 2006, when DHS took custody of R. In 2006, she needed to have an oxygen tank with her at all times. At the time of trial, mother was using oxygen only at night and was able to do daily chores and to walk several blocks without getting winded. Mother's health conditions as of trial included congestive heart failure, organic brain syndrome, sleep apnea, and morbid obesity. Mother testified that she has learned techniques to deal with her memory loss, including writing things down more frequently and using a calendar to record information. However, mother's personal physician, Dr. Fields, testified that mother still has serious health issues and that her ability to care for a young child is "extremely limited" because of her health.[1] Fields also testified that mother is "incredibly committed to her children."

At the request of DHS, mother has had several psychological evaluations. The first evaluation was done by Dr. Sacks in 2002, before mother's cardiac incident. Sacks found mother to have average to low-average intelligence and to be capable of parenting her children.

In 2004, mother saw Dr. Stuckey for another psychological evaluation. Stuckey found her intelligence to be in the low-average to borderline range, and concluded that "[g]iven

---

[1] Fields wrote a letter to DHS in December 2006 that stated, "I believe that it is extremely unwise for [mother] to be the primary caregiver for a child 12 years of age or younger." However, Fields testified that, if he were to write a similar letter at the time of trial, he would not have written it as strongly.

Fields also testified that he was concerned that mother was at risk for a heart attack or other cardiac incident and that, if she were to have another incident, she would likely need to be hospitalized for some time. Although mother's hospitalization would require R to be placed outside of the home for that time, that fact does not make mother unfit to parent.

[mother's] current cognitive, physical, and emotional presentation, as well as her history of poor commitment to making consistent changes following DHS' previous dispositions, strong concerns remain as to [mother's] ability to independently parent."

In December 2006, after R was taken from her home, mother underwent neuropsychological evaluation by Dr. Sacks.[2] At that evaluation, Sacks found mother's intelligence to be borderline and concluded that the drop in intelligence was due to her cardiac incident. Sacks found that mother's thinking was slow and incomplete. Her scores on the memory test administered showed "significant impairment in auditory and visual memory, new learning ability, and concentration skill" and were in the borderline to extremely low range. Sacks concluded that it was unlikely that mother would be "capable of making the changes necessary to parent safely."

Mother saw Dr. Guastadisegni for another neuropsychological evaluation in January 2008. At that evaluation, her intellectual ability was in the borderline range. She also had significant short-term memory impairments. Guastadisegni concluded that mother was not capable of parenting independently.

In October 2008, Guastadisegni did another neuropsychological evaluation after DHS requested it when the caseworker noticed mother's improved health. That evaluation showed that her intelligence level was back in the normal range and at the level that existed before her cardiac incident. However, mother still had problems learning new information. In the opinion of Guastadisegni, mother had the ability to identify R's basic needs, but would have difficulty in understanding and applying the intangible aspects of parenting. Nonetheless, he testified that it would be possible for her to be a fit parent for R with some help from others and with the use of memory aids.

---

[2] A neuropsychological evaluation focuses part of the assessment on cognitive functioning. It looks at how the individual's brain processes information with regard to intellectual functioning, memory, attention and concentration, reasoning, and problem solving.

After reviewing all of the psychological and neuro-psychological evaluations, we give more weight to the most recent evaluation by Guastadisegni. Given the recent improvements in mother's health, we conclude that this evaluation is likely the most indicative of mother's abilities at the time of trial.

Multiple caseworkers from DHS have worked with this family. All of them testified that the family is very close and that R is bonded with mother. However, in their view, mother has difficulty supervising R and establishing behavioral boundaries for him. The social worker who most recently supervised visits between R and mother testified that mother was overly passive with R, that R exhibited some parentification around mother, and that he demonstrated some regressed behavior with her.

■■ This case, at its core, presents the issue of whether DHS has carried its burden of proof under ORS 419B.521(1), which provides, in part, that "[t]he facts on the basis of which the rights of the parents are terminated, unless admitted, must be established by clear and convincing evidence[.]" "Clear and convincing" evidence is evidence that establishes that the truth of the facts asserted is highly probable. *State ex rel Dept. of Human Services v. Smith*, 338 Or 58, 79, 106 P3d 627 (2005). In conducting *de novo* review, we give "considerable weight to the findings of the trial judge who had the opportunity to observe the witnesses and their demeanor in evaluating the credibility of their testimony." *State ex rel Juv. Dept. v. Geist*, 310 Or 176, 194, 796 P2d 1193 (1990). However, where the evidence is not disputed, we assess the record by assigning our own weight to the evidence in light of the statutory requirements imposed by the legislature.

The state contends that mother's rights should be terminated under ORS 419B.504, which provides, in part:

"The rights of the parent or parents may be terminated as provided in ORS 419B.500 if the court finds that the parent or parents are unfit by reason of conduct or condition seriously detrimental to the child or ward and integration of the child or ward into the home of the parent or parents is improbable within a reasonable time due to conduct or conditions not likely to change. In determining such conduct

and conditions, the court shall consider but is not limited to the following:

"(1)   Emotional illness, mental illness or mental retardation of the parent of such nature and duration as to render the parent incapable of providing proper care for the child or ward for extended periods of time.

"(2)   Conduct toward any child of an abusive, cruel or sexual nature.

"* * * * *

"(4)   Physical neglect of the child or ward.

"(5)   Lack of effort of the parent to adjust the circumstances of the parent, conduct, or conditions to make it possible for the child or ward to safely return home within a reasonable time or failure of the parent to effect a lasting adjustment after reasonable efforts by available social agencies for such extended duration of time that it appears reasonable that no lasting adjustment can be effected."

The analysis under ORS 419B.504 first requires us to determine if mother is "unfit by reason of conduct or condition seriously detrimental to the child." That determination has two parts: First, we must determine if mother has engaged in some conduct or is characterized by some condition. Second, we must determine if that conduct or condition is "seriously detrimental" to the child. *State ex rel SOSCF v. Stillman*, 333 Or 135, 145, 36 P3d 490 (2001). If both of those conditions are met, mother is unfit, and we must determine if "integration of the child into the home of the parent or parents is improbable within a reasonable time due to conduct or conditions not likely to change." ORS 419B.504.

The state argues that mother's mental condition qualifies under ORS 419B.504 as a condition that supports termination of her parental rights because "mother's parental ability has been substantially and detrimentally impacted by her cognitive impairment, historical mental health problems, and severe physical health challenges" and because she has failed "to present a viable plan for the return of the child to the parent's care and custody." We agree that the evidence demonstrates that, in 2003, mother's cardiac incident and its effect on her physical and mental health was a condition that

prevented her from being a fit parent. Mother's condition in 2003 or 2006, however, is not the same as it was at the time of the trial in January 2009, as the trial court acknowledged in its findings.

In *State ex rel Dept. of Human Services v. Rardin*, 340 Or 436, 447, 134 P3d 940 (2006), the court reiterated its prior holding, expressed in *Stillman*, that the legislature assumes that conditions can change and that the termination of parental rights can occur only on the basis of present unfitness at the time of trial. Here, the most recent neuropsychological evaluation undisputedly demonstrates that mother's intellectual functioning has returned to normal, that she has the ability to recognize R's basic needs, and that she is able to be a fit parent if provided with some assistance from others, memory aids, and assistance in comprehending new information.

Despite the above evidence, which the trial court apparently took into account, the court ruled that "[t]he real issue at trial was whether mother was able to provide a plan that would make up for her deficiencies." The meaning of that ruling is not clear. Termination of parental rights under ORS 419B.504 requires that DHS demonstrate both that the parent is unfit and that the child cannot be integrated into the parent's home within a reasonable time. If the trial court's judgment is understood to have conflated those two requirements, then the trial court committed error. In other words, if mother is not unfit, then her parental rights may not be terminated without regard to the viability of the plan that she presented. *See Rardin*, 340 Or at 445. However, we need not decide this case on that issue because of the underlying inadequacy of the evidence.

Mother's alleged unfitness under ORS 419B.504 is not established by the purported inadequacy of the resources that she chooses to assist her, as the trial court judgment implies. Although she may be physically and/or mentally impaired to some degree, there is persuasive evidence that she is able to recognize R's basic needs and to make decisions regarding his best interests, including obtaining assistance in providing for his care. Her present abilities indicate that she will be able to arrange for R's needs to be met when she is

personally unable to provide for them. That evidence, even when weighed with conflicting evidence, does not establish that it is highly probable that mother's mental condition at the time of trial rendered her unfit to be R's parent.

Nonetheless, DHS argues that mother's condition—her physical and mental health—has in the past caused her to physically and emotionally neglect R and her other children, and that, if R is returned to her, it is inferable that the neglect will reoccur. The flaw in that argument is that mother's condition is not the same as it was when the neglect occurred in 2006 and that she has had no opportunity to act as a day-to-day parent for R in light of her current mental and physical state. Mother's health has improved significantly since R was removed from her home in 2006. She no longer sleeps during the day, needs to carry oxygen with her, or is incapable of taking care of her own basic needs.

Mother's condition is also different now than it was when DHS intervened in her home in the late 1990s. Mother has the support of another adult, JE, who plans to move in with her, and mother's other adult daughters live near her. Mother has multiple friends who also live close by and who testified that they would check in on her and help mother when needed. Furthermore, at the time of trial, mother did not have any children living with her. Parenting one child, or two if JO is returned to her home, will be under different circumstances than have been present in the past when she was caring for four or five minor children.

Moreover, our review of mother's testimony indicates that she understands R's basic needs and emotional needs and how to meet them. In that context, the implication that mother will have problems with the intangible aspects of parenting is insufficient to demonstrate a serious detriment to R. *See Smith*, 330 Or at 87 ("[t]he deficiencies perceived here are not so severe as to implicate the standard that the statute sets out for the termination of parental rights and likely are no worse than those of thousands of Oregonians who ultimately succeed, without state intervention, in raising their children safely.").

We conclude for the above reasons that, while mother's history with DHS and her health issues are of concern, DHS has failed to prove by clear and convincing evidence that, given mother's significant health improvements, mother is presently unfit under ORS 419B.504. Accordingly, the order terminating mother's parental rights was error.

Reversed and remanded.