Argued and submitted November 2, 2010, reversed and remanded
February 16, 2011

In the Matter of A. L. A.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

T. C. A.,
aka T. C. M.,
*Appellant.*

Lane County Circuit Court
08193J;
Petition Number 08193J02;
A145369 (Control)

In the Matter of A. D. F.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

T. C. A.,
aka T. C. M.,
*Appellant.*

Lane County Circuit Court
08194J;
Petition Number 08194J02;
A145370

248 P3d 24

Andrew D. Coit argued the cause for appellant. With him on the brief was Coit & Associates, P.C.

Karla H. Ferrall, Assistant Attorney General, argued the cause for respondent. With her on the brief were John R. Kroger, Attorney General, and Mary H. Williams, Solicitor General.

Before Ortega, Presiding Judge, and Sercombe, Judge, and Landau, Judge pro tempore.

ORTEGA, P. J.

ORTEGA, P. J.

Mother appeals from judgments terminating her parental rights to her two sons, AA and AF. Both children were removed from mother's care because of concerns that mother was manufacturing and using drugs. Mother engaged in drug treatment and other services, but relapsed into heroin use. The day before the hearing on the petitions to terminate her and father's parental rights,[1] mother completed further treatment, and experts projected that she might be able to resume parenting in six to 18 months. The children were doing well, and there was no evidence that they were likely to suffer harm from waiting six to 18 months for permanency. On this record, we need not address whether mother is unfit, because we conclude that the Department of Human Services (DHS) failed to prove, by clear and convincing evidence, that integration of the children into mother's home was improbable within a reasonable time due to conduct or conditions not likely to change. Accordingly, we reverse and remand.

We state the facts as we find them on *de novo* review, ORS 19.415(3)(a). AA was born in July 2000, and AF was born in March 2007. In April 2008, the children were removed from mother and father's care after DHS received a report from the sheriff's office that mother and father were growing marijuana. Police searched the family home and found drug paraphernalia and dried marijuana in places accessible to children, as well as marijuana and other drug-related items in a search of a previous residence. Mother later pleaded guilty to one count of unlawful delivery of marijuana and two counts of child endangerment.

A DHS protective services worker, Gomez, spoke with AA, then in second grade. He was aware that mother and father grew and smoked marijuana and was able to describe the use of a bong. AA told Gomez that he would get in trouble for talking about selling marijuana and that he worried when people whom he did not know came to the house. The children were placed in substitute care, with

---

[1] AA and AF have different fathers. References in this opinion to "father" are to AF's father. The petition to terminate father's parental rights to AF was denied.

mother's aunt serving as their foster mother through the time of the termination hearing in February and March 2010.

In June 2008, mother admitted that each child had been in a place where unlawful activity involving marijuana occurred and that "controlled substances and paraphernalia were found in a location in the residence within the child's reach." She further admitted that, while under the influence of alcohol or drugs, she had been unable or unwilling to provide necessary care, guidance, and protection and that, if left untreated, her substance abuse presented a threat of harm. The juvenile court took jurisdiction and ordered mother, among other things, to complete a psychological evaluation and a drug and alcohol evaluation, to follow any recommendations for treatment, and to demonstrate a drug-free lifestyle.

Given our resolution of this matter, we need not recount in exhaustive detail mother's efforts to address her behavior that was harming the children, but we provide an overview of that history in order to provide context for our decision to reverse the judgment of termination. We also include evidence of how the children were doing in foster care.

Beginning in June 2008, mother participated in intensive outpatient treatment for cannabis dependence and alcohol abuse at Willamette Family Treatment (WFT). Mother showed a positive attitude and participated in extra services. Although her progress was somewhat mixed from August through November, mother successfully completed treatment and was discharged in January 2009.

While in treatment, mother underwent a psychological examination with Dr. Sorensen. Mother reported a history of frequent marijuana use and explained that previously she had not seriously considered the consequences of drug activity and never expected the children to be removed. She also stated that she and father always supervised the children and told them not to touch drugs or bongs. Although she tried to justify her drug-related behavior, she voiced reasonable insight into the impact of her conduct on the children, and Sorensen found little cause for serious concern about mother's ability to parent.

When the children were removed, each had some delays. AA was at least a year behind in reading, so his foster mother worked with him for an hour every day on reading and got him extra help at his school. AF received early intervention services (essentially special education) and made progress even before the home visit services began. Despite significant delays, his condition improved in a short time, so that he no longer needed services.

Mother did well during visits with the children. She addressed each child's needs, was affectionate, and displayed good parenting skills. However, there is some indication that she occasionally handled things in a way that caused difficulties for AA. For example, when he asked her if she was doing everything that the judge told her to do, she told him she was "doing everything [she was] supposed to be doing and then some." However, as it turned out, mother began using heroin not long after that conversation. She also missed some visits, without giving a satisfactory, if any, explanation at all.

In January 2009, AA began counseling at Options. He was diagnosed with an adjustment disorder with anxiety; further information was needed to rule out the possibility that he also had post-traumatic stress disorder (PTSD), chronic. His therapist, McDonald, testified that AA was traumatized by the separation from mother, partly because he blamed himself for the family's break-up. He also felt anxiety about fighting that he had observed between mother and father.[2]

In February, after finishing the WFT program, mother moved to be closer to the children and, under a plan to transition the children to her care, had 10 to 15 longer visits with them in the foster home, supervised by the children's foster mother. Although mother was good with the children and they were happy to see her, the foster mother suspected that mother might have been high during one or two visits.

---

[2] The juvenile court found that DHS had proved that the children were exposed to domestic violence but had not proved that allegation at a level that would support termination of parental rights. Although there is evidence that father perpetrated some acts of domestic violence against mother, that relationship ended around April 2009, and there is no evidence of violence in mother's current relationship.

Also, mother missed some visits and telephone visits without warning, which upset AA. Because of those difficulties and problems with scheduling, the additional visits were ended at the foster parents' request.

Mother appeared to be doing well but then, in April, missed a urinalysis (UA) test and was dishonest about it. Soon after that, she had a UA that was positive for opiates, and she then entered residential treatment at Pacific Ridge in May 2009. At intake, she reported that she had quit using alcohol and, because of the UAs, marijuana—but that she had used heroin daily for the last six to eight months.[3] The intake counselor diagnosed mother with opioid dependence and noted that mother appeared to be "in the 'lip service' stage of change." Mother was prescribed Suboxone, a medication that decreases opiate cravings and prevents opiate highs.[4] Her progress notes reflect positive change, and mother was discharged on June 1 with a plan to attend outpatient treatment.

Later in June, the juvenile court held a permanency hearing. DHS asked for more time for mother to complete treatment. The court ordered a 90-day extension in the permanency plan and ordered mother to, among other things, follow any and all recommendations for aftercare and relapse prevention and demonstrate a drug-free lifestyle.

After that permanency hearing, AA told the caseworker that he wanted to live with his grandmother, the prospective adoptive placement, because he did not trust mother and was upset with her for not following through as she had promised. AA's desire not to be reunited with mother, coupled with the fact that the case was then over a year old, prompted DHS to seek a change in the permanency plan. In July, after a second permanency hearing, the court changed the plan to adoption.

---

[3] Mother told her mother that she used heroin because it leaves the body faster than marijuana, so she would have an easier time with UAs.

[4] If a person who is not addicted to opiates takes Suboxone, that person gets high, but an addicted person, who has a different tolerance level, does not. A person with a current addiction, however, may use Suboxone as a bridge to avoid withdrawal symptoms until another dose of heroin can be obtained.

During that time, mother engaged in services. She participated in two drug treatment programs at Serenity Lane: an intensive outpatient program that she successfully completed in August, and a recovery support program, which she began in September. Mother also began treatment with Dr. Hayes at Beyond Addictions, who prescribed Suboxone for mother to detoxify and maintain abstinence from heroin. From October to December, while in recovery support, mother also participated in a parenting class, attending every session and displaying a positive, open attitude.

In January 2010, mother, at her attorneys' request, participated in a psychiatric and alcohol and drug evaluation with Dr. Larsen. Larsen found mother to be bright and forthcoming, and he saw no signs of any mental disease other than substance abuse. Mother told Larsen that she was taking Suboxone, was actively involved in Alcoholics Anonymous and Narcotics Anonymous (NA), and was subject to UAs every two weeks through Serenity Lane and her probation officer. Larsen diagnosed alcohol and substance abuse but, at the time, saw no suggestion of active dependence on or addiction to substances.

Unfortunately, it turned out that mother had already relapsed at the time of that evaluation. Three days later, mother submitted to a UA at DHS's request, and it was positive for morphine, consistent with heroin use. Initially, mother insisted that there had been a mistake, but she later admitted that she had been using heroin three or four times per week since late October. At trial, mother acknowledged that, if she had not been caught, she would not have told anyone that she was using.

Mother was discharged from her recovery support program so that she could obtain a higher level of care, and she reentered Pacific Ridge in late January. The intake form placed mother at the acceptance stage (described as "believes they have a problem with alcohol/drugs, yet is unwilling to make all necessary changes to stay sober—the 'yes, but' stage"). According to later notes, mother "[r]ecognizes that alcohol and other drug use has dangerous consequences but is unable to demonstrate capacity to prevent relapse." Mother was discharged on February 16, and the hearing on

the petition to terminate her parental rights began the next day.

Mother denied using drugs after reentering Pacific Ridge. She planned to reengage in aftercare at Serenity Lane, continue Suboxone therapy, and reengage in NA. She was interested in living in an Oxford House and, after that, her father planned to help her get an apartment.

Several experts testified about mother's prognosis for maintaining sobriety and the timeframe for her to be able to parent the children. Sorensen, who had evaluated mother at DHS's request in 2008, was concerned that mother's lengthy engagement in treatment raised questions about her ability to abstain without a high level of support. When asked about the time required for treatment before the return of the children, Sorensen answered,

> "Where substance use, even with treatment, has been a continuing difficulty, the expectation is it takes quite a bit more time; it's very difficult to come up with a specific number because it really depends on her engagement in treatment, her ability to find stable and supportive people to wrap herself in, and just her real commitment to being able to be open and honest about such difficulties."

Sorensen suggested a minimum of three to six months starting from the time that mother is "able to demonstrate a real awareness that she's got the understanding that she knows what things to avoid." For a proper clinical diagnosis, however, Sorensen would have needed more recent contact with mother.

According to Larsen, who had evaluated mother at her attorneys' request about one month before the termination hearing, relapses are common and require more therapy and intervention that address the issues that led to relapse. He testified that mother's recent relapse did not change his overall impressions, although he "can't disagree" with Pacific Ridge's assessment that mother is unable to demonstrate capacity to prevent relapse. Larsen opined that mother's long-term prognosis was very good and that her short-term prognosis was good if she remained on Suboxone with monitoring, had ongoing therapy, started getting into a vocation to support herself, and associated with people who do not use

drugs or alcohol. In Larsen's assessment, mother needed 12 to 18 months of Suboxone therapy, UAs, and individual and group therapy to establish her long-term sobriety.

When asked whether drug or alcohol issues would affect mother's ability to parent, Larsen answered:

> "I think that the presence of alcohol and drug issues affect all parenting issues. However, you have to look at the person's adherence to treatment. You have to look at the presence or absence of mental disease or defect. You have to look at the issues having to do with abuse of the kids, neglect of the kids, things of that sort. And I didn't find any of that in this case."

Based on his review of records and evaluation of mother, Larsen did not see any reason to believe that mother could not effectively parent the children, although he allowed that it would be harmful to children to be brought up in an environment in which drugs were being used or manufactured and that using needles in the presence of the children would present a health risk.

Hayes, who had prescribed Suboxone to mother, thought that there was nothing unusual about multiple relapses, and he testified that some people with histories like mother's do well. Mother needed long-term residential treatment or to live in a halfway house, to be on Suboxone with regular appointments and UAs to monitor compliance, to regularly attend 12-step meetings, and to have a psychiatric evaluation. If she did those things, Hayes thought that she had a good possibility of long-term recovery. He estimated that she should demonstrate at least six months of sobriety before regaining custody.

As for the children, both were doing well with the foster parents and were well-adjusted and bonded with each other. They also were bonded with mother, although that bond apparently weakened over time. Over the course of a year in counseling, AA had made good progress. He was more relaxed and no longer had nightmares or symptoms of PTSD. His therapist, McDonald, testified that, although AA had a little anxiety because of uncertainty about his future, he had been doing quite well. His annual mental health assessment,

dated one and one-half months before trial, describes concerns about his placement as a significant stressor, and, according to McDonald, AA needs "structure, love, caring, protection"; because of not having security for a while, he will need some special care for some time. He is fairly well adjusted and has strengths that will help him transition if he has to move. Over a number of months before trial, AA consistently told McDonald that he wants to live with his grandmother and, when she asked him if he would miss visits with mother, "he said that she had a year to do what she needed to do and she didn't do it." In McDonald's view, AA has emotionally distanced himself from mother and now looks forward to living with his grandmother.

The juvenile court terminated mother's parental rights to both children. Although the court found multiple bases for concluding that mother was unfit, we understand those bases—criminal conduct, addictive or habitual use of controlled substances, mental or emotional abuse of the child, emotional or mental illness, and lack of effort to adjust circumstances or failure to effect a lasting adjustment—to reduce to concerns relating to mother's drug use.[5]

In appealing the judgments, mother contends, among other things, that DHS failed to prove that the children's integration into her home is improbable within a reasonable time due to conduct or conditions not likely to change. In her view, she could be ready to parent in three to 18 months, and that delay is reasonable, given the children's lack of special needs. DHS responds that integration is improbable within a reasonable time, given that mother's drug problem escalated from marijuana to heroin during almost two years in treatment. In DHS's view, AA is ready for permanency with his grandmother now, and AF has spent nearly two out of his three years of life in foster care.

---

[5] The juvenile court also found that mother was unfit because of failure to obtain and maintain a suitable or stable living situation. At the time of the termination hearing, mother had just completed residential treatment and did not have a fixed residence; however, she and her father testified that he would help her find and pay for a suitable apartment after a stay in a halfway house. Assuming that mother's living situation was a condition seriously detrimental to the children, there is no evidence that it would persist so as to prevent reunification within a reasonable time. Accordingly, we conclude that mother's living situation is not a basis for termination of her parental rights.

We begin with the framework for termination of parental rights. ORS 419B.504 provides, in part:

"The rights of the parent or parents may be terminated as provided in ORS 419B.500 if the court finds that the parent or parents are unfit by reason of conduct or condition seriously detrimental to the child or ward and integration of the child or ward into the home of the parent or parents is improbable within a reasonable time due to conduct or conditions not likely to change. In determining such conduct and conditions, the court shall consider but is not limited to the following:

"* * * * *

"(3)  Addictive or habitual use of intoxicating liquors or controlled substances to the extent that parental ability has been substantially impaired."

Under that statute, we must determine not only whether the parent is unfit, but also whether integration of the child into the parent's home is improbable within a reasonable time due to conduct or conditions not likely to change. *State ex rel SOSCF v. Stillman*, 333 Or 135, 145-46, 36 P3d 490 (2001). A reasonable time is "a period of time that is reasonable given a child or ward's emotional and developmental needs and ability to form and maintain lasting attachments." ORS 419A.004(20). The inquiry into a reasonable time "is child-specific. It calls for testimony in psychological and developmental terms regarding the particular child's requirements." *Stillman*, 333 Or at 146. Facts supporting termination of parental rights, unless admitted, must be proved by clear and convincing evidence. ORS 419B.521(1).

Here, we need not decide whether mother is unfit, because we conclude that, in any event, DHS failed to prove that the children's integration into mother's home is improbable within a reasonable time due to conduct or conditions not likely to change. Mother has the skills to be a good parent if she remains sober, and, relapses notwithstanding, she has made some progress in treatment. Although the expert witnesses acknowledged the difficulties of predicting when mother will be far enough into her recovery to be able to parent, they testified that she may well be able to resume caring for the children in a period ranging from six to 18 months.

DHS did not show that mother would be unlikely to achieve sobriety or otherwise meet its burden to prove that it was improbable that mother would be able to provide a safe home for the children in that timeframe. Ultimately, the problem here is that the record is devoid of evidence regarding how such a delay in achieving permanency would affect the children's emotional and developmental needs or their ability to form and maintain lasting attachments.

There was no evidence about AF's needs other than evidence that he has overcome some educational delays and now is doing well. As to AA, his therapist testified that he has emotionally distanced himself from mother and feels "a little bit of anxiety" because of uncertainty about his permanent placement, but is doing well overall. There was no evidence about the effect of that emotional distancing on the prospects for successful reunification of the family and no evidence about how waiting six to 18 months to achieve permanency would affect AA. In short, the record does not contain clear and convincing evidence that a six- to18-month wait to return to mother's home is unreasonable in light of the children's needs. Although the delay that the children have experienced is troubling, we cannot conclude, on this record, that it is improbable that the children can be integrated into mother's home within a reasonable time. Accordingly, we must reverse the termination of mother's parental rights.

Reversed and remanded.